Alan F. GERSMAN, et al., Appellants,

v.

GROUP HEALTH ASSOCIATION, INC.

No. 89–5482.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 7, 1991.

Decided May 7, 1991.

Rehearing Denied July 5, 1991.

David H. Shapiro, with whom Richard A. Salzman, Washington, D.C., was on the brief, for appellants.

Anita Barondes, with whom Christopher A. Weals, Washington, D.C., was on the brief, for appellees.

Before WALD, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Dissenting opinion filed by Circuit Judge WALD.

SENTELLE, Circuit Judge:

Appellants Alan F. Gersman and Computer Security International ("CSI") appeal the district court's decision dismissing their claims against Group Health Association, Inc. ("GHA") for lack of standing and for a failure to state a claim under both § 1981 of the Civil Rights Act and the District of Columbia Human Rights Act ("DCHRA"), D.C.Code § 1–2501 *et seq.* 725 F.Supp. 573. We find that appellant CSI had standing to bring the present claims, but agree with the district court's conclusion that appellant fails to state a claim under either statute. We therefore affirm the district court's dismissal of this case.

## I. BACKGROUND

Appellant corporation CSI is engaged in the business of providing commercial storage of computer software, as well as other software services. From 1983 until 1987, CSI maintained a contractual relationship with health maintenance organization GHA for storage and delivery of GHA's computer software. The original contract specified a one-year term, subject to renewal and modification. The terms of the original contract state:

> The initial term of this agreement shall be for 1 year. After expiration of the initial term, this agreement shall automatically renew for successive one month periods until terminated by either party upon receipt of written notice thirty days before the end of any of these successive periods. For renewal terms, notice of adjustment in the fixed charges shall be supplied in writing not less than forty-five (45) days prior to the renewal date at which the changes will take effect.

Thus, the initial contract governed the relationship from August 1983 until August 1984, and the contract continued to renew automatically on a monthly basis until GHA notified CSI that it was discontinuing the relationship in October 1987.

Appellant Gersman is the president of CSI; he and his wife are also CSI's only shareholders. According to Gersman, CSI and GHA maintained a healthy working relationship until late 1986, when Mohammed Ghafori became the manager of GHA's Management Information System. Gersman alleges that Ghafori had an assistant ask Gersman whether or not he was Jewish and, upon finding that he was, determined to end the contractual relationship between CSI and GHA for that reason. While GHA had been satisfied with CSI's service prior to that time, Gersman began hearing rumors that GHA was dissatisfied. He approached GHA's upper management, who admitted awareness of Ghafori's indirect inquiry, but maintained that there was no link between this inquiry and GHA's recent dissatisfaction. In a final effort to save the contract, Gersman proposed a modification to the contract with terms more favorable to GHA. However, in October 1987, GHA notified Gersman that it was ending its contractual relationship with CSI.

CSI and Gersman brought this action in the district court, alleging that GHA's actions violated both § 1981 of the Civil Rights Act and § 1–2511 of the DCHRA. The district court dismissed both claims upon a motion by GHA, on the grounds that appellants Gersman and CSI lacked standing to bring any discrimination claims against GHA, and that the complaint failed to state a claim under either statute. Appellants then filed this appeal.

## II. DISCUSSION

### A. Standing

■ The district court held that neither Gersman nor CSI had standing to bring discrimination claims against GHA. First, the court determined that Gersman lacked standing because CSI, rather than Gersman, suffered the alleged injury, as it was CSI that had been party to the contractual relationship with GHA. With this we agree. The court then determined that CSI had suffered the alleged injury, but that CSI lacked standing to litigate that injury because a corporation had no racial identity and therefore could not be a legally cognizable victim of discrimination. This we reject.

The court relied on dicta from the Supreme Court's opinion in *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). There, the Court stated that "a corporation ... has no racial identity and cannot be the direct target of the petitioners' alleged discrimination." *Id.* at 263, 97 S.Ct. at 562. The district court found this assertion to be consistent with the nature of a corporation as a legally constructed entity with "an identity separate and distinct from that of its members or organizers."

The court implied that there may be exceptions where "a functional nexus exists between the purpose or activity of the cor-

poration and the identity of the members of that corporation," citing the Second Circuit's opinion in *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702 (2d Cir.), *cert. denied*, 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982). In *Hudson Valley*, the Second Circuit held that a not-for-profit, tax-exempt theatre organization created to serve local black and Hispanic communities had standing to bring civil rights claims against county officials who allegedly denied the organization's funding application for racial reasons. The district court here ruled that even if the Second Circuit is correct, CSI gained no standing because "CSI does not serve to advance Plaintiff Gersman's racial or religious identity but simply his economic interests." Accordingly, CSI lacked a racial or religious identity and therefore had no standing to bring a discrimination claim against GHA.

In our view, however, the determination whether a corporation has a racial identity is not determinative of whether that corporation has standing to bring a discrimination claim. Rather than assume that racial identity is a predicate to discriminatory harm, we might better approach the problem by assuming that, if a corporation can suffer harm from discrimination, it has standing to litigate that harm. As the Supreme Court stated in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the test for prudential standing "is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* at 500, 95 S.Ct. at 2206 (footnote omitted). Assuming § 1981 and DCHRA § 1–2511 to be applicable, we believe that both provisions can be understood to provide relief to a corporate plaintiff.

The Supreme Court has held that a party need not be a member of a protected minority in order to suffer harm from discrimination. For example, in *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), a white homeowner and member of the Little Hunting Park, a nonstock corporation that operated a playground and park in the neighborhood, rented a home to a black person and attempted to transfer his share in the Park to the tenant. The Park refused to approve the assignment because the tenant was black, and expelled the white homeowner from the Park for protesting the refusal. The Supreme Court held that the homeowner had standing to bring a § 1982 action against the Park, because the homeowner was "punished for trying to vindicate the rights of minorities protected by § 1982." *Id.* at 237, 90 S.Ct. at 404. According to the Court, the homeowner must have standing to bring the § 1982 action because "the white owner is at times 'the only effective adversary' of the unlawful restrictive covenant." *Id.* (citation omitted).

The Court relied on its earlier opinion in *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). In that case, a party to a restrictive covenant forbidding homeowners in the neighborhood from renting or selling their homes to non-Caucasians sued another party to the covenant for damages based on a breach of that covenant. The Supreme Court allowed the defendant to claim that the covenant violated the Fourteenth Amendment, even though the defendant herself was a white woman. The Court found that the woman had been injured by the discriminatory covenant because her co-covenantor was seeking damages for breach of the covenant. *Id.* at 256, 73 S.Ct. at 1035. Moreover, the Court concluded that "[t]he relation between the coercion exerted on respondent and her possible pecuniary loss thereby is so close to the purpose of the restrictive covenant, to violate the constitutional rights of those discriminated against, that respondent is the only effective adversary of the unworthy covenant in its last stand." *Id.* at 259, 73 S.Ct. at 1036. Accordingly, the Court concluded that "[s]he will be permitted to protect herself and, by so doing, close the gap to the use of this covenant, so universally condemned by the courts." *Id.* *See also Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9, 14 (1st Cir.1979) ("a [white] person has an implied

right of action [under §§ 1981 and 1982] against any other person who, with a racially discriminatory intent, injures him because he made contracts with non-whites"); *see generally Winston v. Lear–Siegler, Inc.,* 558 F.2d 1266 (6th Cir.1977) (white plaintiff had standing to sue employer under § 1981 when he was fired for protesting the allegedly discriminatory firing of a black employee); *DeMatteis v. Eastman Kodak Co.,* 511 F.2d 306, *modified,* 520 F.2d 409 (2d Cir.1975) (white plaintiff had standing to sue under § 1981 where he alleged his employer forced him into early retirement because he sold his home to a black person); *Faraca v. Clements,* 506 F.2d 956 (5th Cir.), *cert. denied,* 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975); *Park View Heights Corp. v. City of Black Jack,* 467 F.2d 1208 (8th Cir.1972) (allowed white plaintiff to bring § 1981 claim against employer who allegedly refused to hire him because he was married to a black woman).

Here, appellant CSI alleges that it was harmed by the discriminatory actions of GHA. As the above cases have shown, a party may suffer a legally cognizable injury from discrimination even where that party is not a member of a protected minority group. Thus, it is not necessary to determine whether CSI has a "racial identity." Such a query would lead to difficulties of determining what, in fact, constitutes a racial identity. *See, e.g., T & S Service Associates, Inc. v. Crenson,* 666 F.2d 722 (1st Cir.1981) (requiring corporate plaintiff to prove that it was a minority-owned firm in order to bring claim that it was denied contract under § 1981); *Howard Security Servs., Inc. v. Johns Hopkins Hosp.,* 516 F.Supp. 508 (D.Md.1981) (allowed corporation owned and operated by black president to bring § 1981 claim against hospital who allegedly denied contract because of the president's race). For example, in the present case, CSI alleges that it has a racial identity because it is operated and owned by Mr. and Mrs. Gersman, who are both Jewish. Yet the situation would be no different if Gentile shareholders owned CSI and GHA ended the contractual relationship because the corporation had a single Jewish employee. Thus, CSI need not have a "Jewish identity," or even have predominantly Jewish owners or employees, in order to suffer injury from GHA's discriminatory actions.

Therefore, we reject the analysis that a corporation may have standing to assert a discrimination claim only where the corporation has been incorporated expressly for the purpose of furthering minority interests. Because we rest our finding of standing on the fact that the injury suffered by the plaintiff falls within the zone of interests protected by the statute, we need not determine whether a corporation can in fact have a racial identity. While such a determination would be difficult to make, given that a corporation exists as an entity separate from its employees, officers and stockholders, *Moline Properties, Inc. v. Comm'r,* 319 U.S. 436, 439, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499 (1943), the facts as alleged indicate that GHA discontinued its contractual relationship with CSI solely because an individual associated with CSI was Jewish. That injury alone is sufficient to meet the Supreme Court's test for standing. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (plaintiff has standing if it alleges "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief").

■ To hold otherwise would render a whole range of discrimination claims unlitigable. As the district court correctly found, appellant Gersman was not injured by GHA's actions. It was CSI, and not Gersman, whose contract was terminated. Gersman, as a shareholder, has no standing to bring claims for an injury suffered by CSI. *See Gregory v. Mitchell,* 634 F.2d 199, 202 (5th Cir.1981); *Erlich v. Glasner,* 418 F.2d 226, 228 (9th Cir.1969). However, as to the district court's decision that CSI cannot seek redress solely because it is a corporate, rather than individual entity, we conclude that corporate identity is not dispositive of standing where the corporation suffered injury from allegedly discriminatory acts. Accordingly, we hold that CSI

has standing to bring both the § 1981 and the DCHRA § 1–2511 claims in the present case.

### B. *Section 1981 of the Civil Rights Act of 1866*

The district court ruled that the complaint in this case failed to state a claim under § 1981 of the Civil Rights Act of 1866. For purposes of reviewing this dismissal, we must accept as true all CSI's factual allegations, and determine whether the district court correctly held that "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–56, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

Section 1981 of the Civil Rights Act guarantees to all people the right to "make and enforce contracts" under the equal benefit of the laws. As the district court correctly recognized, the controlling case interpreting the "make and enforce contracts" clause of § 1981 is *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). In that case, the Supreme Court interpreted this phrase literally to mean that § 1981 protects individuals only in the making, or formation, of contracts and in the enforcement of contracts through the legal process. Thus, the Court held that § 1981 "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Id.* at 171, 109 S.Ct. at 2369.[1] Under this interpretation, "postformation conduct" such as racial discrimination during a contractual term of employment is not governed by § 1981. Accordingly, the Court held that racial discrimination during a contractual term of employment is not violative of § 1981 but is controlled instead by the contractual relationship itself, and should be governed by state contract law and Title VII of the Civil Rights Act. *Id.* at 180–81, 109 S.Ct. at 2374–75.

Appellant argues first that *Patterson* does not apply to the present case; that *Patterson* is instead limited to the employment context. It bases this assertion on *Patterson's* discussion of the complementary relationship between § 1981 and Title VII. *See id.* at 180–84, 109 S.Ct. at 2374–77. In determining that § 1981 does not apply to postformation conduct, the Court commented that Title VII's application to racial harassment in the employment relationship "should lessen the temptation for this Court to twist the interpretation of another statute (§ 1981) to cover the same conduct." *Id.* at 181, 109 S.Ct. at 2375. Thus, appellants argue, because Title VII does not apply outside the employment relationship, *Patterson's* reasoning necessarily does not apply outside of the employment context.

This argument ignores the plain language of both § 1981 and the *Patterson* opinion. While *Patterson* did, in fact, involve an employment contract, it reached

---

1. The dissent cites the plurality opinion by Justice O'Connor in *Jett v. Dallas Independent School District*, 491 U.S. 701, 711, 109 S.Ct. 2702, 2709–10, 105 L.Ed.2d 598 (1989), and Justice O'Connor's separate opinion in *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 110 S.Ct. 1331, 1339, 108 L.Ed.2d 504 (O'Connor, J., concurring) (1990), as support for the proposition that "*Patterson* itself did not decide whether discriminatory contract terminations were actionable under § 1981." Dissent at 1575 n. 1. However, neither of these cases expressed such reservation. *Jett* simply noted that the defendant school district had not "raised the contention that the substantive scope of the 'right ... to make ... contracts' protected by section 1981 does not reach the injury suffered by petitioner here." (*Citing Patterson, supra*, 491 U.S. at 176– 77, 109 S.Ct. at 2372–73) (omissions in original). Far from expressing misgivings concerning the reach of *Patterson*, Justice O'Connor merely notes that a case decided seven days after *Patterson* rather unsurprisingly did not raise the *Patterson* arguments. Similarly, in her one-paragraph concurrence in *Lytle*, Justice O'Connor notes "that the question whether petitioner has stated a valid claim under § 1981 remains open." *Lytle*, 110 S.Ct. at 1339. However, her reason for noting that it remained open was not that the reach of *Patterson* was uncertain, but that *Patterson* "was decided after the Court of Appeals issued" the decision under review in *Lytle*, so that "the applicability of § 1981 to these claims was not specifically addressed." *Id.*

its holding by applying § 1981, a statute that applies to all contractual relationships. Indeed, the Court specifically recognized that "interpreting § 1981 to cover racial harassment amounting to a breach of contract would federalize all state-law claims for breach of contract where racial animus is alleged, *since § 1981 covers all types of contracts, not just employment contracts." Id.* at 183, 109 S.Ct. at 2376 (emphasis added). Thus, the Court expressly recognized that its holding would be relevant beyond the scope of employment cases. *Cf., e.g., Perry v. Command Performance*, 913 F.2d 99, 101 n. 3 (3d Cir. 1990) (rejecting contention that *Patterson* was limited to the employment context); *Gonzalez v. Home Ins. Co.*, 909 F.2d 716, 723 (2d Cir.1990) (rejecting contention that § 1981 has broader scope where Title VII remedies are unavailable). Consequently, we conclude that the non-employment context does not affect *Patterson's* applicability to the present case.

■ Having determined that *Patterson's* holding applies outside the employment context, we must now determine whether, under *Patterson*, § 1981 applies to contract terminations. This is an issue of first impression before this Court. However, other courts of appeal have almost universally interpreted *Patterson* to mean that termination of a contract is not covered by § 1981 because termination constitutes postformation conduct. *See, e.g., Williams v. First Union Nat'l Bank*, 920 F.2d 232 (4th Cir.1990); *Prather v. Dayton Power & Light Co.*, 918 F.2d 1255 (6th Cir.1990); *Gonzalez v. Home Ins. Co.*, 909 F.2d 716 (2d Cir.1990); *McKnight v. General Motors Corp.*, 908 F.2d 104 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991); *Walker v. S. Central Bell Telephone Co.*, 904 F.2d 275 (5th Cir. 1990); *Overby v. Chevron, USA, Inc.*, 884 F.2d 470 (9th Cir.1989).

One circuit, the Eighth, has held to the contrary. *Hicks v. Brown Group, Inc.*, 902 F.2d 630 (8th Cir.1990), *vacated and remanded*, —— U.S. ——, 111 S.Ct. 1299, 113 L.Ed.2d 234 (1991). Although that case was the law of the Eighth Circuit at the time of oral argument in this case, the Supreme Court has since vacated and remanded *Hicks* to the Eighth Circuit for reconsideration in light of the court's pending *en banc* opinion in *Taggart v. Jefferson County Child Support Enforcement Unit*, 915 F.2d 396 (8th Cir.1990), *reh'g granted* Dec. 11, 1990. In the panel opinion in *Taggart*, the court expressly stated that it agreed with the majority of the other circuits which held that, under *Patterson*, § 1981 does not apply to termination cases. *Id.* at 397. Nonetheless, the *Taggart* court found itself compelled to follow *Hicks* because it remained the governing law of the circuit. The *en banc* review in *Taggart* will of course allow that circuit to reconsider its own precedent.

■ We agree with the majority of circuits who have held that, under *Patterson*, § 1981 does not apply to contract terminations. We find this conclusion appropriate in terms of the language of both § 1981 and the *Patterson* opinion. The Court was clear in stating that § 1981 "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Patterson*, 491 U.S. at 171, 109 S.Ct. at 2369. The Court therefore held that § 1981 does not apply to racial harassment within the contract relationship, or even racial harassment that rises to the level of a breach of contract. *Id.* at 182–83, 109 S.Ct. at 2375–76. The Court emphasized that "[c]onduct amounting to a breach of contract under state law is precisely what the language of § 1981 does not cover." *Id.* at 183, 109 S.Ct. at 2376.

Similarly, the language of § 1981 does not speak of contract terminations. Like breach of contract, a termination "impairs neither the right to make nor the right to enforce a contract." *Id.* A termination necessarily arises after the contract is already made, and, like a breach of contract, is more appropriately dealt with under state contract law.[2]

---

**2.** Our dissenting colleague inexplicably insists

upon accusing us of "equat[ing] termination of

The dissent argues that this position is unduly formalistic, rendering meaningless the protections of § 1981 because it "prohibits an employer from refusing to hire an applicant because of her race, yet allows the employer to fire that person the next day because of her race." Dissent at 1578 (emphasis deleted). The dissent cites as an example of this "formalism" the Third Circuit's opinion in *Perry v. Command Performance*, 913 F.2d 99 (3d Cir.1990). In *Perry*, the plaintiff's husband made an appointment for the plaintiff to have her hair styled at the defendant's salon. When the first stylist was unavailable to style the plaintiff's hair, a second stylist refused to do so, stating that she did not "deal with blacks." *Id.* at 100. The Third Circuit held that § 1981 would protect the plaintiff against such discrimination only if it occurred during the making of the contract, and remanded the case for the district court to determine whether the contract was formed at the time the appointment was made or at the time the hair stylist refused service—a distinction the dissent describes as illustrating the "pitfalls of the timing-related formalism." Dissent at 1576. However, the *Perry* Court went on to state that, even if the contract were made at the time the husband made the appointment, such a contract would violate § 1981 if the contract were made on discriminatory terms, *i.e.*, if it were implicit in the contract that the salon would provide services to the petitioner only if she were white. If this were the case, the court concluded that "it would be consistent with *Patterson* to allow plaintiff to proceed with her section 1981 claim." *Id.* at 102.

Here, there is no indication that, at the time the contract was made, an implicit condition of the contract was that Gersman not be Jewish. In the scenarios described by the dissent, however—where an employee is hired one day under the strictures of § 1981 and fired the next—the discrimination would be implicit in the making of the contract as well as the termination. While that situation is not before us, the Third

Circuit may well be correct that it would be covered by § 1981 under *Patterson* because the contract would have been made under discriminatory terms. In short, we follow *Patterson* by its terms, in its construction of § 1981 to govern contract formation and enforcement, not all contract-related incidents.

■ Given this conclusion, we must now discern whether GHA's actions in the present case did in fact "terminate" the contract. Appellants argue that GHA did not terminate the contract, but instead refused to renew the contract for the next month. However, the contract at issue in this case did not require the parties to reach a new agreement at the beginning of every month. Rather, the contract renewed until the parties took an affirmative action to terminate it. *Cf., e.g., Chawla v. Klapper*, 743 F.Supp. 1284 (N.D.Ill.1990) (contract was terminated where defendant declined to continue renewal of series of one-year teaching contracts). In this way, the contract resembled an employment-at-will contract.

In the context of an employment-at-will contract, the Seventh Circuit rejected an argument similar to appellant's claim here that each monthly renewal constituted a new contract. *McKnight v. General Motors Corp.*, 908 F.2d at 109. In *McKnight*, the court found that "[e]mployment at will is not a state of nature but a continuing contractual relation. Wages, benefits, duties, working conditions, and all (but one) of the terms are specified and a breach of any of them will give the employee a cause of action for breach of contract." *McKnight*, 908 F.2d at 109 (citations omitted). Similarly, all the terms of the relationship between the parties to the present case were governed by the terms of the original contract.

Appellants base their claim on *Nelson v. School Bd. of Palm Beach County*, 738 F.Supp. 478 (S.D.Fla.1990). In that case, the district court held that the plaintiff had

a contract with a breach of contract." Dissent at 1575. This we obviously do not do. Rather, like the Supreme Court in *Patterson*, we discuss

the effect of broadening § 1981 beyond its terms in relation to both breach and termination.

made out a valid § 1981 action when her contract as a school principal expired and the school district declined to renew her contract for another term as principal, transferring her instead to the position of classroom teacher. Contrary to appellant's interpretation, *Nelson* did not rest its finding of standing simply on the school board's failure to renew the plaintiff's contract, but also on her commensurate demotion. In *Patterson,* the Court recognized that a contractual relationship could change to such a degree that it would constitute a new contract. The Court found that a promotion could be considered a "new" contractual relationship, depending "upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract." *Patterson,* 491 U.S. at 185, 109 S.Ct. at 2377. A promotion involves such an opportunity "[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer." *Id.* (citation omitted).

Appellants argue that the fact that the parties were free to modify the contract terms governing price, and that, in September, appellants proposed a new price structure that GHA never accepted, establish that the parties had the opportunity to enter a "new" contract at each renewal period. These factors, they argue, indicate that the contract was a "new" contract each month, and that the monthly renewals and modifications should be considered preformation conduct. However, as the district court pointed out, both the renewals and modifications were expressly governed by the terms of the contract—the activities appellants label "preformation" were actually "postformation" actions taken pursuant to the existing contract.

Moreover, CSI's offer of more favorable terms to GHA is insufficient to create a "new" contractual relationship as required by *Patterson.* *See Chawla,* 743 F.Supp. at 1291 (a "new" contract begun each year on the same terms as the prior contract does not fit within the *Patterson* exception). For example, in *Harrison v. Associates Corp. of North America,* 917 F.2d 195 (5th Cir.1990), the Fifth Circuit held that a promotion did not constitute a new contractual employment relationship because it involved only a small raise, with no "significant change in duties and responsibilities." *Id.* at 198; *see also Green v. Kinney Shoe Corp.,* 728 F.Supp. 768, 777 (D.D.C.1989) (promotion constituted a "new and distinct" contractual relationship where it involved different responsibilities, as well as a new means of evaluating employee and calculating employee's salary). Because the parties' obligations to one another did not change upon any of the contract "renewals," we conclude that GHA and appellants were engaged in a continuous contractual relationship, and that GHA's actions in this case terminated that contractual relationship.

Thus, as § 1981 does not apply to terminations of contractual relationships, we conclude that appellants fail to state a claim under § 1981. We therefore affirm the district court's decision to dismiss this action for a failure to state a claim.

### C. *District of Columbia Human Rights Act Section 1-2511*

■ The District of Columbia Human Rights Act guarantees that

[e]very individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to, in employment, in places of public accommodation, resort or amusement, in educational institutions, in public service, and in housing and commercial space accommodations.

D.C.Code Ann. § 1-2511. Although appellant CSI recognizes that its claims do not fall within the categories listed in § 1-2511, it claims that GHA's actions deprived CSI of the opportunity to participate equally in the economic life of the District of Columbia. Appellant focuses on the phrase "including, but not limited to," as implying that § 1-2511 may be interpreted to include such actions as wrongful termination of a contract.

The district court held that § 1–2511 protects only those activities that are specifically enumerated within the statute. The court rejected appellant's claim that the DCHRA's general protection of an individual's equal opportunity to participate in the economic life of the District prohibited GHA's allegedly discriminatory termination of the contract. According to the court, "deciding what conduct constitutes an impingement of opportunity to participate in the 'economic life' of the District of Columbia" would be to open a "Pandora's box." The court concluded that it was "unwilling[ ] to assume the role of legislator," and left the phrase "economic life" to be fleshed out by future legislation.

At the time of the district court's decision, there were no opinions by District of Columbia courts to guide the court in interpreting § 1–2511. Since that time, however, two relevant opinions have been released: *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285 (D.C.App.1989), and *Justice for Janitors v. Apartment & Office Bldg. Owners Ass'n, Memorandum Opinion and Order*, Civ. No. 88–09695 (D.C.Super.Ct. Dec. 4, 1989). In *Sorrells*, the plaintiff argued that her wrongful discharge claim constituted a cause of action under the DCHRA as a whole. The court rejected this claim, noting that the plaintiff did not "rely on any specific provision of the Human Rights Act; rather she asks this court to 'broaden' the policies expressed in the Human Rights Act and to fill a perceived 'gap' in the Act." *Sorrells*, 565 A.2d at 289. The court relied on the absence of language directed toward wrongful discharge actions, emphasizing that the court "cannot rewrite [the Act] or extend its coverage beyond the limits set by the legislature." *Id.* In the court's view, the plaintiff's claim was "an invitation to judicial activism, which we unequivocally decline." *Id.*

*Justice for Janitors* dealt expressly with the provision at issue in this case, § 1–2511, as well as § 1–2501. In that case, a union of janitors claimed that the defendant association of apartment and office building owners violated the DCHRA by barring union janitors from their proper-

ty. The court rejected the janitors' argument that "the expansive language of D.C. Code §§ 1–2501 and 2511 provide the statutory authority for a cause of action for discrimination based on a characteristic not specifically identified in the act." *Justice for Janitors, Memorandum Opinion and Order*, at 11. The court emphasized that § 1–2511 did not create any rights, and that language relating to the Act's purpose was merely "hortatory and without substantive effect." *Id.* at 12.

Because we are interpreting the laws of the District of Columbia, we are obliged to follow the interpretation of the District's own courts. *Hall v. Ford*, 856 F.2d 255, 267 (D.C.Cir.1988) ("In considering [a] pendant claim, we are of course bound by the law of the District of Columbia, as authoritatively interpreted by the D.C. Court of Appeals."). Moreover, the cases are consistent with the district court's appropriate conclusion that we risk judicial activism by interpreting the phrase, "an equal opportunity to participate fully in the economic ... life of the District" beyond the scope of those activities specifically enumerated in the statute. Since the District of Columbia courts have declined to extend their interpretation of the statute outside the scope of the enumerated protected activities, we decline to do so as well. We therefore affirm the district court's conclusion that CSI's complaint does not state a claim under DCHRA § 1–2511.

### III. CONCLUSION

For the foregoing reasons, we conclude that appellant CSI, and not appellant Gersman, has standing to bring the present claims. However, we agree with the district court that CSI's complaint fails to state a claim under either 42 U.S.C. § 1981 or DCHRA § 1–2511. The decision of the district court is therefore

*Affirmed.*

WALD, Circuit Judge, dissenting as to Part II.B.:

I dissent from the majority's holding that 42 U.S.C. § 1981 does not guarantee free-

dom from discriminatory contract terminations on the basis of race or creed. I believe that a reasonable interpretation of § 1981's equal "right [ ] to make [ ] contracts" necessarily includes the right to be free from discriminatory termination of those contracts and that *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), supports such an interpretation. Accordingly, in my view, the appellants have stated a valid claim under § 1981.

## I.

The majority offers two arguments in support of its holding that racially-motivated contract terminations are not actionable under § 1981.[1] First, the majority contends that *Patterson* establishes that the scope of § 1981 does not extend to "postformation conduct" and that, therefore, contract termination (which indisputably occurs "postformation") is not actionable under that section. Second, the majority equates termination of a contract with a breach of contract. Since *Patterson* indicated that racial harassment to the point of breach was beyond the scope of § 1981, the majority argues that contract terminations are similarly not actionable under that section. I believe that each of these arguments is infirm.

## A.

The majority's "postformation" argument is flawed in two ways. First, the analysis relies on selective quotations from the *Patterson* opinion. Throughout *Patterson,* the Court spoke not simply of "postformation conduct" but more precisely of "postformation conduct by the employer *relating to the terms and conditions of continuing employment.*" 109

S.Ct. at 2374 (emphasis supplied). *See also id.* at 2372 ("problems that may arise later from the conditions of *continuing* employment"); *id.* at 2373 ("postformation conduct [that] implicates ... the conditions of *continuing* employment"); *Prather v. Dayton Power & Light Co.,* 918 F.2d 1255, 1260 (6th Cir.1990) (Boggs, J., dissenting). Termination, although irrefutably "postformation," does not concern *"continuing* employment"—but rather the very *dis*continuation of employment. The holding of *Patterson* was that harassing conduct in the course of continuing employment was not actionable under § 1981; that case said nothing about the complete termination of employment.

More critically, the majority's argument depends almost entirely on drawing very fine and formal distinctions among three concepts: "refusal to contract," "contract termination," and "refusal to renew a contract"—even when actual events indicate that any or all of these concepts might apply. The majority contends that the first of these (refusal to contract) is always actionable under § 1981; that the second (contract termination) is never actionable; and that the third (refusal to renew) is sometimes actionable. Accordingly, the sometimes-metaphysical distinctions among these three concepts are outcome-determinative.

For example, in this case, CSI heard rumors of Group Health's dissatisfaction with CSI's services and, in mid-September 1987, promptly offered to lower the price for its services. Group Health rejected the offer and, on October 6, 1987, gave notice that it was cancelling its contract with CSI. The majority holds that Group Health's rejection of CSI's new offer was not a refusal to

---

1. *Patterson* itself did not decide whether discriminatory contract terminations were actionable under § 1981. *See Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 2709, 105 L.Ed.2d 598 (1989); *Lytle v. Household Manufacturing, Inc.,* 494 U.S. 545, 110 S.Ct. 1331, 1339, 108 L.Ed.2d 504 (O'Connor, J., concurring) (1990). The Seventh Circuit also recognized as much, stating:

   We show no disrespect to the Supreme Court by suggesting that the scope of *Patterson* is

uncertain. The glory of the Anglo–American system ... is that general principles are tested in the crucible of concrete controversies. A court cannot be assumed to address and resolve in the case in which it first lays down a rule every controversy within the semantic reach of the rule.

*Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1312 (7th Cir.1989).

contract but rather the termination of an existing contract. Similarly, the majority holds that Group Health's cancellation of the automatically renewing contract was not a refusal to renew but instead also a contract termination. Therefore, the majority concludes, neither of Group Health's actions falls within the scope of § 1981.

As this scenario indicates, there are two types of formalism at work here. The first is the formalism of classification: for example, was Group Health's rejection of CSI's new offer a (possibly actionable) refusal to renew—or a (never actionable) termination? The survival of CSI's cause of action turns on this characterization. A second and equally Orwellian formalism is implicated by the timing of the parties' actions: under the majority's analysis, if CSI had made a second offer just a few days later—for example, on October 7, *just after Group Health terminated the contract*—then Group Health's rejection of the new offer would presumably have constituted a refusal to contract and would therefore be actionable under § 1981.

The pitfalls of the timing-related formalism are illustrated by the Third Circuit's recent decision in *Perry v. Command Performance*, 913 F.2d 99 (3d Cir.1990). In that case, Perry's husband telephoned a hair salon to set up an appointment for his wife. The scheduled hairdresser fell ill and Abbott was asked to style Perry's hair. Abbott, however, balked and "responded loudly, 'No, no, no, no! I don't do black hair.... Oh, no, I'm not going to do your hair, I'm from New Hampshire and I don't deal with blacks.'" *Id.* at 100. The Third Circuit, applying reasoning similar to the majority's, remanded the case to the district court for a finding of when the contract between Perry and the salon was formed. Under this analysis, Perry's § 1981 cause of action turns solely on whether her contract with the salon was made when her husband set the appointment. If it was, then Abbott's refusal to serve Perry constituted contract termination, and was not barred by § 1981; if,

however, a contract for a hair stylist's services is created only when performance begins, then Abbott's action was a refusal to contract, and *was* barred by § 1981.[2]

The real world of contract belies such stark formalisms. In the context of automatically renewing contracts—such as CSI's agreement with Group Health or the standard employment-at-will contract—termination and a refusal to renew are, for all intents and purposes, the same thing. In such situations, it is pointless (or, what is worse, conclusory) to quibble over whether the cancellation of a contract is "preformation" or "postformation" conduct—cancellation is *both:* it is both the end of an existing contract and a refusal to enter into a new contract. Despite these realities, the majority's analysis hangs precariously upon such ethereal distinctions. Such formalism, I believe, is both unsound and inappropriate in basic civil rights law.

### B.

The majority's second argument is also infirm. *Patterson*, the majority notes, held that harassment—including harassment amounting to a breach of contract—is not actionable under § 1981. The majority likens termination to harassment to the point of breach and concludes that termination is also not actionable under § 1981. *See* Majority opinion ("Maj. op.") at 1571. But the majority's analogy is flawed: termination is critically different from both harassment and breach.

As recognized in a range of legal contexts, a contract consists of a bundle of rights. *Cf. Hishon v. King & Spalding*, 467 U.S. 69, 74–75, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). An employment contract, for example, encompasses, *inter alia*, claims to certain wages, benefits, privileges, work conditions, and remedies. Harassment or other discrimination in the performance of a contract deprives the target of one or more of these claims. Even when a party is harassed to the point of breach, she retains

2. For a further discussion of such anomalies, *see* Burton, *Racial Discrimination in Contract*

*Performance*, 25 Harv.C.R.–C.L.L.Rev. 431, 431–33 (1990).

her rights under the contract and can enforce the contract under state law. But contract *termination*, in contrast, strips a target of *all* of her claims, of the entire bundle of rights.[3] And in this critical way, termination is different in kind from harassment or breach.

The *Patterson* Court itself made this distinction in holding that, while there would ordinarily be no cause of action for a discriminatory failure to promote, if "the promotion rises to the level of an opportunity for a *new and distinct relation* between the employee and the employer," § 1981 would be implicated. 109 S.Ct. at 2377 (emphasis supplied) (citing *Hishon*). To extend the metaphor, a failure to promote is not actionable under § 1981 if the new position would alter only a few sticks in the bundle (by providing a pay raise, or a new office, or a new title), but rather only if the new position effectively involved an entirely new bundle of rights—such as the move from law associate to partner in *Hishon.* By severing *all* relations between the parties, termination represents an even more dramatic change than a *Hishon*-type promotion and so falls completely outside of *Patterson*'s holding.

This understanding of § 1981's protection against discriminatory termination is also supported by the Supreme Court's rulings on the scope of § 1982, which guarantees all persons equal rights "to inherit, purchase, sell, hold and convey real and personal property." 42 U.S.C. § 1982.[4] The Court has frequently ruled that § 1982 bars racially-motivated refusals to sell or rent property. *See, e.g., Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Tillman v. Wheaton–Haven Recreation Association, Inc.*, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). However, in *Memphis v.*

*Greene*, 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981), the Court indicated that not all infringements on the use of property were within the reach of § 1982. In *Greene*, the city closed the main thoroughfare between an all-white neighborhood and a predominantly black neighborhood. Although the closing was found to "inconvenience" black residents, the Court concluded that such an injury "does not involve any impairment of the kind of property interests that we have identified as being within the reach of § 1982." *Id.* at 124, 101 S.Ct. at 1598. As in property, so as in contract: although a partial deprivation of equal rights is not actionable, a total deprivation is actionable.

Thus, contrary to the suggestion of the majority, there is a critical difference between breach and termination, between Patterson's harassment and Group Health's rescission: while Patterson retained some rights under her contract, CSI was left with *no* contractual rights whatsoever. Simply put, discriminatory contract termination involves nothing less than the complete *un*making of contracts and thus falls squarely within the scope of § 1981's guarantee of "the same right [to] make [ ] contracts."

## II.

Ultimately, the shortcomings of the majority's analysis stem from its constricted interpretation of § 1981. In narrowly interpreting § 1981's guarantee to "[a]ll persons [of] the same right ... to make and enforce contracts" the majority must distinguish "formation" from "termination" and "renewal" and ends up entangled in legal formalisms and distinctions that are analytically unsatisfying.

---

**3.** The majority's suggestion that a "termination ... is more appropriately dealt with under state contract law," Maj. op. at 1571, seems to confuse *termination* with *breach*. Like the plaintiff in this case, most terminated parties in a commercial contract would have *no* state contract law claim.

**4.** Because the "operative language of both § 1981 and § 1982 is traceable to the [Civil

Rights] Act of [ ] 1866," the Supreme Court has suggested that, whenever possible the two sections be given a common interpretation. *Tillman v. Wheaton–Haven Recreation Association, Inc.*, 410 U.S. 431, 439–40, 93 S.Ct. 1090, 1094–95, 35 L.Ed.2d 403 (1973); *see also Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987).

I would apply a more straightforward interpretation of § 1981. In my view, § 1981's guarantee of "the same right [ ] to make [ ] contracts" prohibits persons from refusing to stand in a contractual relationship with another party solely because of that party's race. Whether that refusal takes the form of a refusal to contract, a termination, or a refusal to renew a contract makes no difference. In each case, one party is wholly denied the opportunity to engage in contractual relations on the basis of his race. Interpreting § 1981 in this way, I believe that freedom from racially-motivated termination of a contract is, both practically and logically, an inextricable aspect of the equal right "to make [ ] contracts." [5]

As a practical matter, if § 1981 prohibits an employer from refusing to hire an applicant because of her race, yet allows the employer to *fire* that person the next day because of her race, then the law's promise of "the same right [ ] to make [ ] contracts" is empty. Section 1981 cannot meaningfully be interpreted to distinguish between the employer who says to an applicant face-to-face "I would hire you, but for your race" and the employer who hires a person sight unseen and then, upon meeting him, promptly fires him because of his race. In real-life terms, the employee who is not hired and the employee who is fired end up in precisely the same place: without a job because of the color of their skins.

As a logical matter as well, the equal right to make contracts necessarily encompasses the freedom from racially-motivated contract terminations. Stated broadly, contracts and contract law comprise an effort to reduce future uncertainty in social interaction, to forge predictability by melding the institution of promises and the rule of law. As the opening sentence of Corbin's classic treatise states: "The main purpose of contract law is the realization of reasonable expectations induced by promises." 1 *Corbin on Contracts* § 1 (1963). By enacting § 1981, Congress established that this basic form of power—the power to use legal institutions to reduce uncertainty about the future—must be equally available to persons of all races.[6] Congress' intent is as thwarted by the racially-motivated termination of contracts as it is by the racially-motivated refusal to contract. Either practice denies an individual equal access to contracts and contract law, and either practice is a violation of § 1981.

In sum, like the Eighth Circuit panel whose decision is now pending reconsideration, I conclude that "[t]he right to make contracts would be rendered virtually meaningless unless it encompasses the right to be free from discriminatory deprivations of such contracts." *Hicks v. Brown Group, Inc.*, 902 F.2d 630, 639 (8th Cir.1990), *vacated*, —— U.S. ——, 111 S.Ct. 1299, 113 L.Ed.2d 234 (1991). Any narrower interpretation of § 1981 is both analytically unsatisfying and morally troubling.

For these reasons, I respectfully dissent.

---

**5.** The legislative history of § 1981 strongly supports this understanding of the equal "right [ ] to make [ ] contracts." *See Hicks v. Brown Group, Inc.*, 902 F.2d 630, 642–48 (8th Cir.1990), *vacated*, —— U.S. ——, 111 S.Ct. 1299, 113 L.Ed.2d 234 (1991); *see also* Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981*, 98 Yale L.J. 541 (1989).

**6.** This view of § 1981 makes sense of that section's protection of both the right to "make" and the right to "enforce" contracts. If discriminatory conduct takes place *within* a contract (such as breach or harassment), a plaintiff can seek redress in contract law and § 1981 need only protect the plaintiff's access to the courthouse (the right to "enforce"); if, however, discriminatory conduct fully bars a plaintiff's access to contracts and contract law and deprives her of a contract-law remedy (as does termination), § 1981 creates a more substantive cause of action (the right to "make" contracts).