**Felicia WATKINS, Plaintiff,**

v.

**BESSEMER STATE TECHNICAL COLLEGE, Defendant.**

Civ. A. No. 91–AR–2773–S.

United States District Court, N.D. Alabama, S.D.

Feb. 6, 1992.

Hycall Brooks, III, Penick & Brooks, Birmingham, Ala., for plaintiff.

R. David Proctor, Sirote and Permutt P.C., Birmingham, Ala., Lee Bains, Bains & Terry, Bessemer, Ala., Edward M. George, Alabama Dept. of Postsecondary Educ., Div. of Legal & Personnel Services, Montgomery, Ala., for defendant.

## MEMORANDUM OPINION

ACKER, District Judge.

Felicia Watkins, plaintiff in the above-entitled cause, together with plaintiffs in

numerous other pending cases of alleged employment discrimination in this and other courts, have filed motions for leave to amend their complaints to request trial by jury and to claim the kinds of damages provided in the Civil Rights Act of 1991, which was signed into law on November 21, 1991. This particular plaintiff, who is black and claims to be the victim of race discrimination by her employer, Bessemer State Technical College, invoked 42 U.S.C. § 1981 in her original complaint. By invoking the new Act, which contains an addendum to § 1981, she again invokes § 1981.

■ Ms. Watkins quite naturally agrees with the result, if not with the entire rationale of this court in *King v. Shelby Medical Center*, 779 F.Supp. 157 (N.D.Ala.1991), a case in which Shelby Medical Center, the employer-defendant, after this court's decision, applied to the Eleventh Circuit for permission to take an interlocutory appeal. Bessemer Tech, defendant in this case, together with defendants in similar cases, just as naturally disagree with *King* and are asking this court to reconsider the position it took in *King* that allowed retroactive application of the Civil Rights Act of 1991. Incidentally, in *King* this court forgot to include *Rhodes v. Piggy Wiggly Ala. Distrib. Co.*, 741 F.Supp. 1542 (N.D.Ala.1990), in the list of this court's opinions on Seventh Amendment application to statutory causes of action.

Both before and after this court's decision in *King* various courts predictably have gone in different directions on the question of retroactivity vs. prospectivity of the new Act. The Supreme Court not only has a pending petition for writ of certiorari seeking a review of *United States v. Peppertree Apts.*, 942 F.2d 1555 (11th Cir.1991), which was the primary influence for *King*, but on December 23, 1991, the Eighth Circuit in *Hicks v. Brown Group, Inc.*, 952 F.2d 991 (8th Cir.1991), said:

> [W]e believe the question of the retrospective effect of the Civil Rights Act of 1991 in this case should be presented to the Supreme Court in a petition for writ of certiorari.

This court understands that the petition for writ of certiorari which the Eighth Circuit requested in *Hicks* was filed on January 7, 1992. If there ever was a debate that needed quick resolution by the Supreme Court, the retroactive vs. prospective application of the new Act is it. The lower federal courts (and state courts, which have always had concurrent jurisdiction of cases brought under 42 U.S.C. § 1981, and which, by recent Supreme Court interpretation, acquired concurrent jurisdiction over cases brought under Title VII) may disagree on what the outcome of this debate should be, but they are unanimous in believing that the Supreme Court should decide the matter quickly. The Supreme Court anticipated the seriousness of the general debate over whether or not new statutes should be applied only prospectively in *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), wherein the justices expressed strong but varying points of view on the subject. *Bonjorno* may or may not be a reliable indicator of what the nine present justices will say as they face the current volatile question of how to apply the new Act.

This court has received excellent briefs on both sides of the issue. This court would be inclined to retreat from *King* and to subscribe to the persuasive reasoning employed by Judge Gesell in *Van Meter v. Barr*, 778 F.Supp. 83 (D.D.C.1991) (that is, except for the jury trial question in § 1981 cases, discussed *infra*), and to reject the reasoning employed by Judge Hart in *Mojica v. Gannett Co., Inc.*, 779 F.Supp. 94 (N.D.Ill.1991), *if* this court did not deem itself bound by *Peppertree*, which the employer-defendants in this court's pending cases have not yet distinguished to the satisfaction of this court. Some defendants simply disagree with *Peppertree*, perhaps hoping that *Peppertree* will be overruled by the Supreme Court. Other defendants, while disagreeing with *Peppertree*, also try to distinguish it, an enterprise this court declined to attempt in *King* and still declines to attempt, believing that *Peppertree* cannot be distinguished without straining in a transparent way.

Joining in the hope that the issue will be resolved expeditiously by the Supreme Court, this court for the present adheres to its opinion in *King.* Nevertheless, in an effort to accommodate to differing possible Supreme Court answers, this court will submit to the jury separate verdict forms or special interrogatories for the purpose of creating a means for differentiation between the various forms of relief, distinguishing those admittedly available to Ms. Watkins prior to November 21, 1991, from those that are subject to the current debate and that may or may not turn out to be available to her. This device will provide the capability for obtaining answers to discrete questions, some of which may thereafter become moot. It also will allow this and similar cases to proceed to trial without waiting for the problem to be solved by the Supreme Court.

In *King* this court stated its belief that the question of entitlement to a jury trial is not necessarily controlled by the outcome of the retroactive vs. prospective argument which surrounds the new Act. Not only does *Wooddell v. International Brotherhood of Elec. Workers Local 71,* — U.S. ——, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991), cited in *King,* indicate the Supreme Court's current belief, contrary to current Eleventh Circuit precedent, that "lost wages cannot be treated as restitutionary", *Id.* at ——, 112 S.Ct. at 496, but there is now a new decision by the Court of Appeals for the District of Columbia Circuit, which, from a slightly different perspective, focuses upon the distinction between "lost wages" as an alleged equitable remedy and "lost wages" as an alleged legal remedy. Whether *Hubbard v. Environmental Protection Agency,* 949 F.2d 453 (D.C.Cir.1991), will make it to the Supreme Court, it nevertheless constitutes a recent, excellent illustration of the evolving argument over how properly to characterize "lost wages". This court happens to agree with Judge Wald's dissent in *Hubbard,* where she writes:

> [B]ack pay or lost wages traditionally have been viewed as money damages and not specific relief, *see* Dan B. Dobbs, *Handbook on the Law of Remedies* 924–27, 929–31 (1973) ("*Dobbs on Reme-*

*dies*"); Arthur G. Sedgwick, *A Treatise on the Measure of Damages* 3, 1343 (9th ed. 1920....

\* \* \* \* \* \*

An award of back pay would be the classic case of "money damages" to compensate him for the time he was wrongfully kept off the job.

\* \* \* \* \* \*

*Bowen* [*v. Massachusetts* ], cites *Dobbs on Remedies* for the basic distinction between compensatory damages and specific relief. *Id.* [487 U.S. 879] at 895, 108 S.Ct. [2722] at 2732 [101 L.Ed.2d 749 (1988) ]. Yet Dobbs' treatise is quite clear that back pay or lost wages is compensatory relief in the nature of damages. *See Dobbs on Remedies* at 924–27, 69 n. 18. Additionally, classifying back pay as specific, as opposed to compensatory, relief contradicts the *Bowen* Court's repeated description of the Back Pay Act, 5 U.S.C. § 5596, as a law that provides *compensation* for past injury, 487 U.S. at 901 n. 31, 904 n. 39, 906 n. 42, 108 S.Ct. at 2735 n. 31, 2737 n. 39, 2738 n. 42.

\* \* \* \* \* \*

The majority relies on *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), for the proposition that back pay is deemed an equitable remedy under Title VII Maj. op. at 463. The language of *Albemarle* makes clear, however, that back pay under Title VII is designed to "compensat[e]" or "make whole" the victim of illegal discrimination. *Id.* at 418–19, 95 S.Ct. at 2372.

> [T]he general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed.

*Id.* (quoting *Wicker v. Hoppock*, 73 U.S. (6 Wall.) 94, 99, 18 L.Ed. 752 (1867)).[8]

_____

[8] The *Albemarle* Court's use of the term "equitable remedy" in relation to back pay clearly referred to the courts' equitable discretion under Title VII whether or not to award back pay at all. *See* 422 U.S. at 414–18, 95 S.Ct. at 2370.

949 F.2d at 471–74.

A petition for rehearing, with suggestion for rehearing *en banc*, has been filed in *Hubbard* and is pending.

More important to this court's belief that Ms. Watkins is entitled to a jury trial under § 1981 (whether or not under a retrospective application of the new Act she is entitled to compensatory damages for her mental anguish, and/or to punitive damages under Title VII) than the rapidly accelerating recognition of lost wages as compensatory damages which would trigger Seventh Amendment entitlement, is certain language in the new Act itself, which amended 42 U.S.C. § 1981 so that it now reads as follows:

> *(a)* All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) *For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.*
>
> (c) *The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of State law.*

(1991 addition underlined).

It is unnecessary to look to legislative history in order to know that the purpose of this amendatory language was to manifest total Congressional disagreement with the Supreme Court's interpretation of § 1981 in *Patterson v. McLean*

*Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). It is noteworthy that the language which Congress chose in the Civil Rights Act of 1870, which contained what is now designated in the United States Code as § 1981, has never been changed. The 1991 addendum did not change that language one iota. Rather, Congress in 1991 simply articulated its own previous understanding of the meaning of the words "make and enforce contracts", words chosen by it in 1870. Congress obviously has an understanding of the original intent of § 1981 contrary to the understanding expressed by the majority in *Patterson*. This unique situation creates a question of statutory construction markedly different from, and much narrower than, the question of whether Congress in 1991 intended its new civil rights legislation to apply to employer-employee transactions that occurred prior to the enactment date, November 21, 1991. The rule of statutory construction which this court finds both applicable and overwhelmingly persuasive under these peculiar circumstances is explained as follows in *Sutherland's Statutory Construction:*

> Although a presumption of change in legal rights is probably reasonable in that an amendment is more frequently used to add or take a provision from a law than to interpret it, the fact of amendment by itself does not indicate whether the change is of substance or form—whether a right is added to or taken from the original act, or whether a provision in the original act is merely being interpreted, that is, made more detailed and specific. *To determine this the circumstances surrounding the enactment must be looked to. If they indicate that the legislature intended to interpret the original act, the presumption is rebutted. An amendment of an unambiguous statute indicates a purpose to change the law, whereas no such purpose is indicated by the mere fact of an amendment of an ambiguous provision.*

1A Sands, *Sutherland's Statutory Construction* § 22.30 at 266 (4th ed. 1985) (footnotes omitted; emphasis supplied).

The same proposition appears in *Corpus Juris Secundum,* as follows:

An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act, and a legislative determination that the primary objectives of an act and its amendments are essentially the same, although not binding on the court, will be given great weight. It has been held, however, that subsequent amendments cannot be considered as indicating the intention of the legislature in adopting the earlier statutes, and a subsequent amendment cannot be considered in construing the original statute *where the original statute was not ambiguous.*

82 C.J.S. *Statutes* § 384, at 899–900 (1953) (footnotes omitted; emphasis supplied).

Between 1870, the year of § 1981, and 1989, the year of *Patterson,* Congress never felt it necessary to clarify or to explain what it meant by the phrase "to make and enforce contracts". In 1991, only because of *Patterson,* it felt forced to express itself. The existence of a 121–year–long ambiguity is proven beyond a reasonable doubt by what the justices of the Supreme Court said in *Patterson,* in which five justices went one way and four justices went another in their interpretations of the central language in § 1981. The fact that honorable, thoughtful and intelligent justices of the Supreme Court differed dramatically and hotly in their reading of § 1981 constitutes irrefutable proof that the language adopted in 1870, and unchanged when *Patterson* was decided, was "ambiguous". Therefore, the recent addendum to § 1981 neatly falls into the unusual, but judicially recognized, category of an amendment that was not intended to *change* the law but only to *clarify* it and to make it easier for the bench to comprehend original Congressional intent. As Justice Holmes said for the Supreme Court in *United States v. Stafoff,* 260 U.S. 477, 43 S.Ct. 197, 67 L.Ed. 358 (1923):

Of course a statute purporting to declare the intent of an earlier one might be of

great weight in assisting a Court when in doubt. . . .

260 U.S. at 480, 43 S.Ct. at 199.

As a whole, the Supreme Court in *Patterson* clearly was "in doubt". If this court had been presented with the same question in 1989 presented to the Supreme Court in *Patterson,* this court might well have agreed with the *bare majority* of that court. In 1991 Congress was simply agreeing with the *bare minority* in *Patterson* in order to resolve the obvious doubt. In its addendum to § 1981 in the Civil Rights Act of 1991, Congress straightforwardly and unequivocally let be known the meaning of the language it, as the legislative branch, had employed in 1870. Its purpose was simply to resolve the ambiguity. Whether that ambiguity was latent or patent is unimportant.

If § 1981 prior to *Patterson* meant what Congress now says it meant, the tool of statutory construction recognized by Justice Holmes and by Professor Sutherland leads straight to the conclusion that *Patterson* was wrongly decided and that § 1981 was, in fact and law, available to Ms. Watkins prior to November 21, 1991, when she filed her complaint, and to other black plaintiffs, as a statutory vehicle for making claims of race discrimination against their employers under factual circumstances as to which *Patterson* temporarily stood in their way.

The Eleventh Circuit has long subscribed to the general proposition that claims properly brought under § 1981 entitle either party to trial by jury. *Whiting v. Jackson State Univ.,* 616 F.2d 116, *reh'g denied,* 622 F.2d 1043 (5th Cir.1980). *See also Setser v. Novack Inv. Co.,* 638 F.2d 1137 (8th Cir.1981), *cert. denied,* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981); *Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194 (1st Cir.1987); *Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290 (7th Cir.1987). This is true not only because of the Seventh Amendment's well understood application to all claims for compensatory damages, but because § 1981 has always allowed a plaintiff to recover both compensatory and punitive damages in appropriate

cases. The language in the new Act allowing recovery of compensatory and punitive damages carefully avoids changing the pre-existing law as regards compensatory and punitive damages *in § 1981 cases*. It only provides caps on damages in Title VII cases. Otherwise, it might have been to the employers' advantage to claim retroactivity for the new Act in § 1981 cases. The fact that Congress expressly and ostentatiously refused to place a ceiling on the damages recoverable under § 1981 only confirms the Congressional intent to leave § 1981 just as it was before *Patterson*, and in the new Act to do no more than to resolve the "doubt" highlighted in *Patterson* over what Congress meant in the first place. In its new Act Congress carefully neither added to nor subtracted from § 1981, thus effectively mooting any issue of whether or not the addendum to § 1981 is to be retroactively applied. Therefore, the right to jury trial, recognized in *King* and reaffirmed in this opinion as to § 1981 cases, does not depend upon the giving of retroactive effect to the provision of the new Act that provides for trial by jury in cases brought by employees under Title VII, because § 1981 actions carried the right to jury trial long before November 21, 1991, and still carry that right.

After this opinion was in final draft form, the court learned that the Supreme Court has impliedly agreed with what this court says. On January 27, 1992, the Supreme Court summarily vacated the decision of the Court of Appeals for the District of Columbia Circuit in *Gersman v. Group Health Assoc.*, 931 F.2d 1565 (D.C.Cir.1991), wherein that court followed *Patterson* and concluded in a case filed before November 21, 1991, that a claim for racially motivated employment contract termination is not proscribed by § 1981. The Supreme Court said of *Gersman*, with a meaning that can hardly be misunderstood:

> The petition for a writ of certiorari is granted. The judgment is vacated and the case is remanded to the United States Court of Appeals for the District of Columbia Circuit for further consideration *in light of the Civil Rights Act of 1991.*

*Gersman v. Group Health Assoc.*, —— U.S. ——, 112 S.Ct. 960, 117 L.Ed.2d 127 (1992) (emphasis supplied). This court can conceive of no reason for the Supreme Court to vacate and remand *Gersman* unless the Supreme Court believes, as does this court, that the Civil Rights Act of 1991 effectively eliminates the effect of *Patterson* even in cases which preceded that Act. The decision of the Supreme Court in *Gersman* constitutes a more powerful reason than anything said by this court previously to support the conclusion this court had independently reached without knowing about *Gersman*. It is of passing interest that Judge Wald, who dissented in *Hubbard*, also dissented in *Gersman*. She was right in both cases.

Still hoping that the issues presented by Ms. Watkins' motion in the above-entitled case will be finally resolved by the Supreme Court before this case reaches trial, this court will, by separate order, grant plaintiff's motion for leave to amend for the reasons set forth above, and in *King*.