960 F.2d 1370
 58 Fair Empl.Prac.Cas. (BNA) 786,
58 Empl. Prac. Dec. P 41,384, 60 USLW 2624
 Georgianna FRAY, Appellee/Cross-Appellant,
v.
The OMAHA WORLD HERALD COMPANY, publisher of the Omaha World
Herald Newspaper, a Nebraska corporation,
Appellant/Cross-Appellee.
 Nos. 91-2439, 91-2443 and 91-2713.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 7, 1992.
Decided April 3, 1992.
Rehearing and Rehearing En Banc
Denied March 31, 1993.
 
 Soren S. Jensen, Omaha, Neb., argued (J. Russell Derr, on brief), for appellant/cross-appellee.
 Michael B. Kratville, Omaha, Neb., argued, for appellee/cross-appellant.
 Before BEAM, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.
 LOKEN, Circuit Judge.
 
 
 1
 This appeal requires us to decide whether § 101 of the Civil Rights Act of 1991 (the "Act") applies retroactively to cases pending when it was enacted. The Omaha World Herald appeals a judgment entered after a jury verdict in favor of Georgianna Fray, a former employee. The jury found that the World Herald violated 42 U.S.C. § 1981 when it failed to promote and then constructively discharged Fray, claims that are precluded by Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Fray contends that the Act preserved her judgment by legislatively overruling Patterson. Concluding that the Act does not apply retroactively to pending cases, we reverse the district court's judgment on Fray's § 1981 claims and remand for a redetermination of whether she should be afforded equitable relief on the parallel judgment in her favor under Title VII.
 
 I.
 
 2
 Fray was hired as a part-time production worker in the World Herald's mailroom on August 24, 1984. As a part-time employee, she worked approximately thirty hours per week at this minimum wage position, primarily operating a machine that inserts advertising supplements into the newspapers.
 
 
 3
 Fray applied to be a full-time mailroom apprentice in June 1985. The posted job notice described the apprentice duties as "counting, addressing, inserting, stacking, and bundling of newspapers," and advised that mechanical aptitude is necessary and mailroom experience preferred. The apprentice position paid $6.05 per hour and offered a full-time employee's benefits package and the opportunity to become a journeyman after four years. Fray was interviewed for the position, but the World Herald promoted a white male truck driver who, though familiar with local zip codes, had no mailroom experience.
 
 
 4
 Fray filed employment discrimination claims with the Nebraska Equal Opportunity Commission and the Equal Employment Opportunity Commission, alleging that sex and race discrimination tainted the failures[1] to promote. She subsequently filed an additional charge alleging retaliatory discrimination as a result of her initial charges. On May 5, 1986, while these charges were pending, the World Herald promoted Fray to a full-time mailroom position (though not an apprentice position). She nevertheless left the company on May 20, 1986.
 
 
 5
 After receiving notices of her right to sue, Fray commenced this action in June 1987, alleging race, sex, and retaliation discrimination in violation of § 1981, Title VII, and state law.[2] In June 1989, the Supreme Court decided in Patterson that § 1981 is limited to claims involving "a refusal to enter into an employment contract on the basis of race." 491 U.S. at 182. In October 1989, one month before trial, the World Herald moved for partial summary judgment, arguing that Fray's § 1981 claims were foreclosed by Patterson. The district court summarily denied the motion as untimely, and the § 1981 claims were tried to a jury on November 28-29, 1989.
 
 
 6
 At trial, in addition to presenting evidence on her claims of failure to promote, Fray described a number of incidents of alleged racial harassment that contributed to her decision to leave the World Herald, including her car being vandalized near the plant and the World Herald's alleged failure to remove obscene graffiti about her in the men's bathroom. The World Herald presented testimony contradicting these allegations and defending its promotion decisions.
 
 
 7
 At the conclusion of the trial, the district court submitted Fray's § 1981 claims to the jury and reserved her Title VII claims. Answering special interrogatories, the jury found that the World Herald had violated § 1981 in failing to promote Fray to mailroom apprentice and awarded $36,907 in compensatory damages, $100,000 in punitive damages, and $5,000 for emotional distress. Based upon this verdict, the district court entered judgment for Fray on her § 1981 and Title VII claims but did not award any relief in addition to the amount awarded under § 1981. The district court denied the World Herald's JNOV motion, which was based in part on Patterson; awarded Fray $38,106.18 in costs and attorneys' fees; and denied Fray's motion to amend the judgment to include interest from the date of the jury verdict. Both parties filed timely notices of appeal.
 
 II.
 
 8
 We first conclude that, if Patterson applies, Fray's § 1981 judgment must be reversed for two reasons. First, the district court charged the jury that it could award increased damages if it found that the alleged instances of racial harassment had resulted in Fray's constructive discharge in May 1986. In Taggart v. Jefferson County Child Support Enforcement Unit, 935 F.2d 947, 948 (8th Cir.1991) (en banc), we held that Patterson precludes an employee from recovering for discriminatory discharge under § 1981. Although Fray argues that her constructive discharge claim went to the jury as a damage theory rather than as a separate cause of action, we fail to see the difference from the standpoint of applying Taggart, and in any event we think it clear that the damages awarded by the jury were based upon constructive discharge as a separate, actionable wrong. For this reason alone, Fray's § 1981 judgment must be reversed under Patterson.
 
 
 9
 In addition, we conclude that Patterson forecloses Fray's failure-to-promote claim under § 1981 altogether. The Supreme Court in Patterson expressly addressed whether promotions can ever be actionable under its restrictive construction of § 1981:
 
 
 10
 [T]he question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981.... Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981. Cf. Hishon v. King & Spaulding, 467 U.S. 69 [104 S.Ct. 2229, 81 L.Ed.2d 59] (1984) (refusal of law firm to accept associate into partnership) (Title VII).
 
 
 11
 491 U.S. at 185-86, 109 S.Ct. at 2377-78 (emphasis added). The promotion sought by Fray from part-time mailroom production worker to mailroom apprentice did not constitute such a new and distinct contractual relation.
 
 
 12
 If promoted, Fray would have received longer hours, higher wages, increased benefits and career advancement opportunities. But she would have continued to be a non-supervisory employee working at an hourly wage in the same department. Her job duties would have been basically the same--in Fray's own words at trial:
 
 
 13
 The only thing I would have to learn was the zip code[s] and the tying machine that part-time workers did not work on.
 
 
 14
 Many circuits have held, and we agree, that each step down the path of one's career does not create a new and distinct relation with the employer for purposes of the Patterson test.[3] As the Ninth Circuit commented in Sitgraves v. Allied-Signal, Inc., 953 F.2d 570, 573 (9th Cir.1992), Patterson "strongly suggests that, in addition to an increase in pay and duties, an actionable promotion claim must involve a meaningful, qualitative change in the contractual relationship," such as the Supreme Court's example of a promotion from law firm associate to partner. The promotion which Fray sought does not meet that test. Therefore, the World Herald is entitled to JNOV on her § 1981 claim under Patterson.
 
 III.
 
 15
 The Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071-1100, was signed into law on November 21, 1991. Section 101(2)(b), to be codified at 42 U.S.C. § 1981(b), amends § 1981 to overrule Patterson:
 
 
 16
 (b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
 
 
 17
 The Act states that its purpose is "to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes." Pub.L. No. 102-166, § 3(4). Simply put, Fray's § 1981 claims fail under Patterson but would succeed under the Act.[4] Our next critical question, therefore, is whether this new statute applies retroactively to § 1981 claims, such as Fray's, that were pending on appeal at the time of enactment. To our knowledge, only one circuit court has ruled on this question, holding that the Act does not apply retroactively. Vogel v. City of Cincinnati, 959 F.2d 594 (6th Cir.1992). Numerous district courts faced with the issue have reached conflicting conclusions.[5]
 
 
 18
 A. The Law of Statutory Retroactivity.
 
 
 19
 It was a principle of ancient Roman civil law that legislation must be prospectively applied unless the legislature specifically decreed a retroactive application. This principle was incorporated into the English common law and carried forward through the centuries by venerable common law chroniclers such as Bracton, Coke, Blackstone, and Sir Francis Bacon. See generally Elmer E. Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn.L.Rev. 775, 775-781 (1936).
 
 
 20
 Prior to 1969, this was a long and well-established principle of American jurisprudence as well:
 
 
 21
 [T]he first rule of construction is that legislation must be addressed to the future, not to the past ... [and] a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature."
 
 
 22
 Greene v. United States, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964); see also United States v. Magnolia Co., 276 U.S. 160, 162-63, 48 S.Ct. 236, 237-37, 72 L.Ed. 509 (1928) ("Statutes are not to be given retroactive effect or construed to change the status of claims fixed in accordance with earlier provisions unless the legislative purpose so to do plainly appears"). Indeed, prior to 1969, American constitutional law was more hostile to the retroactive application of statutes than English common law--many Supreme Court cases held that even legislatively mandated retroactivity may violate the Contract, Due Process, or Ex Post Facto clauses of the Constitution. See Smead, 20 Minn.L.Rev. at 790-797.
 
 
 23
 The Supreme Court destabilized this rather settled doctrine in Thorpe v. Housing Auth. of the City of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), and again in Bradley v. Richmond School Bd., 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). Without acknowledging the centuries of decisions seemingly to the contrary, the Court held in Thorpe and Bradley that a new statute must be retroactively applied to a case that was pending on appeal at enactment "unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U.S. at 711, 94 S.Ct. at 2016.
 
 
 24
 Although many lower courts have interpreted Bradley as establishing a new retroactivity standard, the Supreme Court has now made it clear that Bradley did not silently sweep away the traditional principle. In United States v. Security Ind. Bank, 459 U.S. 70, 79-80, 103 S.Ct. 407, 412-13, 74 L.Ed.2d 235 (1982), for example, the Court discussed at length "[t]he principle that statutes operate only prospectively, while judicial decisions operate retrospectively." In Bennett v. New Jersey, 470 U.S. 632, 639, 105 S.Ct. 1555, 1560, 84 L.Ed.2d 572 (1985), the Court referred to the "venerable rule of statutory interpretation" that "statutes affecting substantive rights and liabilities are presumed to have only prospective effect." And in Bowen v. Georgetown University Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988), Justice Kennedy for a unanimous Court restated the traditional principle without even citing Bradley or Thorpe:
 
 
 25
 Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.
 
 
 26
 In the Supreme Court's latest case involving legislative retroactivity, Thorpe and Bradley came under even more vigorous attack. Justice Scalia argued in a concurring opinion (i) that Thorpe was based upon a misinterpretation of Chief Justice Marshall's opinion in United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801); (ii) that it is logically "quite impossible" to apply a presumption of retroactivity only to cases pending on appeal; and (iii) that Bradley's "manifest injustice" exception "is just a surrogate for policy preferences.... a rule of discretion, giving judges power to expand or contract the effect of legislative action." Kaiser Alum. & Chem. Corp. v. Bonjorno, 494 U.S. 827, 844-57, 110 S.Ct. 1570, 1580-87, 108 L.Ed.2d 842 (1990). Despite acknowledging the "apparent tension" between Bradley and the traditional principle of nonretroactivity, the Supreme Court majority in Bonjorno declined Justice Scalia's invitation to reconcile these two lines of precedent. Id. at 837, 110 S.Ct. at 1577.
 
 
 27
 The Court's failure to resolve this issue in Bonjorno leaves us with two contradictory rules of construction. Under the Bradley test, we must apply the Act to pending cases unless it provides expressly to the contrary or manifest injustice would result from retroactive application. But under Georgetown Hospital, the Act is prospective only unless it expressly provides for retroactive application. We recently reviewed these conflicting precedents in Simmons v. Lockhart, 931 F.2d 1226, 1230 (8th Cir.1991), and concluded:
 
 
 28
 [Where] Congress's silence is ambiguous ... one must choose between the Bradley and Georgetown Hospital presumptions. The better rule is that of Georgetown Hospital.... [T]he presumption against retroactive application best preserves the distinction between courts and legislatures: the former usually act retrospectively, settling disputes between persons, the latter usually act prospectively, setting the general rules for future conduct.[6]
 
 
 29
 See also National Wildlife Fed. v. A.S.C.S., 955 F.2d 1199, 1204 (8th Cir.1992); Criger v. Becton, 902 F.2d 1348, 1353-54 (8th Cir.1990).
 
 
 30
 Both Bradley and Georgetown Hospital recognize that the courts must give effect to a clear congressional directive as to a statute's retroactivity. Such a directive would allow us to determine the retroactivity of this Act without having to resolve this thorny doctrinal conflict. We must therefore examine the Act and its legislative history to determine whether Congress has provided sufficient evidence to discern its intent on this question.
 
 
 31
 B. The 1991 Act and Its Legislative History.
 
 
 32
 The legislative history begins in 1990, when Congress passed a civil rights bill that retroactively overruled Patterson and certain Supreme Court Title VII decisions.[7] The President vetoed the 1990 bill, and Congress failed to override that veto. Among the reasons cited by the President for his veto was the bill's "unfair retroactivity rules." 136 Cong.Rec. S.16562 (daily ed. Oct. 24, 1990).
 
 
 33
 When Congress took up this subject in 1991, the House again passed a bill retroactively overruling Patterson.[8] In the Senate, bi-partisan sponsors drafted a compromise bill, S.1745, during the summer of 1991. S.1745 deleted the 1990 bill's retroactivity provisions. See 137 Cong.Rec. S.15503-12 (daily ed. Oct. 30, 1991). S.1745 passed the Senate on November 5, 1991, and the House on November 7, see 137 Cong.Rec. H.9557-58 (daily ed. Nov. 7, 1991), and became law when the President signed it two weeks later. See President's Signing Statement, 1991 U.S.C.C.A.N. 768.
 
 
 34
 The text of the Act does not address whether it is generally to apply retroactively. Section 402(a) provides that, "[e]xcept as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment." Since many regulatory statutes contain a compliance grace period, a provision clarifying that the Act would be immediately effective is hardly evidence of congressional intent that it be applied retroactively, particularly when Congress deleted explicit retroactivity provisions from earlier bills. At most, this effective date section creates (or preserves) an ambiguity as to whether Congress intended the Act to be generally retroactive.
 
 
 35
 Two provisions of the Act are expressly made prospective. Section 109 specifically overrules EEOC v. Arabian Amer. Oil Co., --- U.S. ----, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991), by providing that Title VII applies to U.S. citizens employed in foreign countries. This section is prospective with respect to all covered employers:
 
 
 36
 The amendments made by this section shall not apply with respect to conduct occurring before the date of the enactment of this act.
 
 
 37
 Pub.L. No. 102-166, § 109(c). Section 103 overrules Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). It is subject to a more limited non-retroactivity provision:
 
 
 38
 Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975 and for which an initial decision was rendered after October 30, 1983.
 
 
 39
 Pub.L. No. 102-166, § 402(b). Section 402(b) was intended solely to protect the Wards Cove Packing Company from any retroactive application of § 103 to its ongoing litigation. See 137 Cong.Rec. S.15963 (daily ed. Nov. 5, 1991) (statement of Senator Kennedy).[9]
 
 
 40
 Turning to the Act's legislative history, there were no legislative committee reports explaining S.1745. In the congressional floor debates, however, both proponents and opponents of retroactivity spoke extensively on the issue. They agreed that Congress was "leav[ing] it to the courts to determine the extent to which the bill will apply to cases and claims that are pending on the date of enactment." 137 Cong.Rec. S.15963 (daily ed. Nov. 5, 1991) (statement of Sen. Kennedy). But, not surprisingly, they disagreed as to how the courts should interpret this congressional abdication. Demonstrating a sophisticated understanding of how judges dissect legislative history, congressional proponents of retroactivity argued that Bradley's presumption of retroactivity would of course apply, while opponents argued with equal vigor that Georgetown Hospital's presumption of non-retroactivity would carry the day. The opposing sides also placed conflicting interpretive legal memoranda in the legislative record.[10] Though it appears that a greater number of legislators expressed the prospective-only view, that is hardly conclusive.
 
 
 41
 We think a rather clear picture emerges from this review of the Act and its legislative history. Proponents of retroactively overruling Patterson commanded a majority in both houses of Congress, but they could not override the President's veto of a 1990 bill that contained express retroactive provisions. Thus, proponents could do no better than send an ambiguous law to the judiciary. On the other hand, opponents of retroactivity who favored enactment of a prospective law (including the President) were also willing to hand this controversial issue to the judiciary by passing a law that contained no general resolution of the retroactivity issue. However, whenever a congressional majority could be marshalled, retroactivity opponents "hedged their bets" by expressly making specific provisions, such as § 109, prospective only.
 
 
 42
 C. Section 101 of the Act Is Not Retroactive.
 
 
 43
 (1) If the presumption against retroactivity reflected in Georgetown Hospital applies, we think it clear that Patterson has not been retroactively overruled because the Act does not contain "a clear indication that [Congress] intend[ed] to diverge from the norm of acting prospectively." Simmons, 931 F.2d at 1230. The 1990 bill contained specific retroactivity provisions and was vetoed in part for that reason. The 1991 Act omitted those provisions, and the debate in both houses emphasized the need to pass a bill that the President would sign. See, e.g., 137 Cong.Rec. S.15344 (daily ed. Oct. 29, 1991) (statement of Sen. Kennedy); id. at H.9515 (daily ed. Nov. 7, 1991) (statement of Rep. Foley). This sequence of events is highly probative. "Congress' elimination of an explicit command is some evidence that it did not intend to depart from the usual principle of construction." Security Ind. Bank, 459 U.S. at 81-82, 103 S.Ct. at 413-15. Of course here, due to the Supreme Court's conflicting retroactivity precedents, Members of Congress disagreed as to what would be "the usual principle of construction." However, all of them knew from their 1990 experience that, because of the President's veto power, they could not enact a law that purported to legislate retroactively.
 
 
 44
 Fray argues that the prospective-only provisions, §§ 109(c) and 402(b), reflect a congressional intent that the Act as a whole apply retroactively. It is true that the sponsor of the amendment that became § 402(b) initially believed that his amendment was necessary because the Title VII provisions of the Act would otherwise apply retroactively to Wards Cove Packing. See 137 Cong.Rec. 15954 (daily ed. Nov. 5, 1991) ("Dear Colleague" letter). However, during the ensuing debate over this amendment, both sides of the retroactivity debate repeated their conflicting pronouncements as to the presumption of retroactivity, and numerous Senators stated that their vote in favor of this amendment did not reflect an intent that the remainder of the Act apply retroactively. See 137 Cong.Rec. S.15963-67 (daily ed. Nov. 5, 1991). There seems to have been no floor debate whatsoever on § 109(c), so it provides no basis for inferring a general intent as to retroactivity.
 
 
 45
 Though we have searched long and hard, we cannot find anything in the Act or its legislative history confirming that retroactive overruling of Patterson was "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature."[11] We agree with the Tenth Circuit that clear congressional intent to apply a statute retroactively cannot be derived "solely from the circumstance that Congress acted to amend existing law in response to a Supreme Court opinion." DeVargas v. Mason & Hanger-Silas Mason Co., 911 F.2d 1377, 1387 (10th Cir.1990). We note that the EEOC--the agency responsible for enforcing the Title VII provisions of the Act--has announced that it will apply the Act only to cases arising after its effective date. See 60 U.S.L.W. 2418 (Jan. 7, 1992). In these circumstances, we conclude that there is insufficient evidence in the language and legislative history of the Act to support its retroactive application under the Georgetown Hospital rule.
 
 
 46
 (2) If the Bradley test applies, the retroactivity question is much closer. This case does not fall within the "manifest injustice" exception to Bradley's presumption of retroactivity. Fray sought damages under § 1981 for discriminatory failure to promote and constructive discharge. The conduct at issue occurred before Patterson, at a time when prior cases warned that such conduct could be actionable under § 1981. See, e.g., Johnson v. Railway Express Agency, 421 U.S. 454, 459-460, 95 S.Ct. 1716, 1719-20, 44 L.Ed.2d 295 (1975). Moreover, that conduct was clearly actionable under Title VII. In these circumstances, retroactive application of § 101 to this pending case would neither alter the rights and expectations of the parties nor disturb previously vested rights.[12] See Bess v. Bess, 929 F.2d 1332, 1334-35 (8th Cir.1991); Iowa Power & Light Co. v. Burlington Northern, Inc., 647 F.2d 796, 805-07 (8th Cir.1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982).
 
 
 47
 However, Bradley itself noted that the presumption of retroactivity does not apply if "there is statutory direction or legislative history to the contrary." 416 U.S. at 711, 94 S.Ct. at 2016. In Bonjorno, the Supreme Court majority demonstrated that it will find evidence of "clear congressional intent" that a statute be prospective from rather faint legislative signs. See 494 U.S. at 837-40, 110 S.Ct. at 1576-79.
 
 
 48
 Here, the President vetoed a bill containing an explicit retroactivity provision. That veto could not be overridden and a compromise bill omitting those provisions was then enacted. Whatever ambiguities may be found elsewhere in the Act and its legislative history, we think this history is dispositive, even under Bradley. When a bill mandating retroactivity fails to pass, and a law omitting that mandate is then enacted, the legislative intent was surely that the new law be prospective only; any other conclusion simply ignores the realities of the legislative process. See Norman J. Singer, 2A Sutherland Statutory Construction § 48.04 (5th ed. 1992).
 
 
 49
 Therefore, whether we apply the traditional Georgetown Hospital principle of presumptive non-retroactivity, which we think is the better rule, or the conflicting Bradley test, we conclude that § 101 of the Act, overruling Patterson, should not be retroactively applied to pending cases or other pre-enactment conduct.
 
 IV.
 
 50
 For the foregoing reasons, we conclude that Fray's judgment on her § 1981 claims must be reversed. However, after reviewing the record, we find no reason to disturb the jury's factual findings of racial discrimination, which were binding on the district court with respect to Fray's claim under Title VII. See, e.g., Jiles v. Ingram, 944 F.2d 409, 413 (8th Cir.1991). Therefore, Fray's judgment on her Title VII claim must be affirmed.
 
 
 51
 We have no doubt that the district court's decision not to award Fray relief under Title VII was based upon the jury's award of substantial damages under § 1981, which we have now reversed. Accordingly, we remand the case to the district court for a redetermination of what relief may be appropriate under Title VII. Given this disposition, we do not reach the World Herald's contention that the award of attorneys' fees was procedurally flawed, since the district court will no doubt be asked to revisit the question of attorneys' fees after the proceedings on remand. We reject Fray's cross appeal for additional interest on the jury's verdict as moot.
 
 
 52
 HEANEY, Senior Circuit Judge, dissenting.
 
 
 53
 I believe that Georgianna Fray has stated a cause of action against The Omaha World Herald under 42 U.S.C. § 1981. I disagree with the majority on two counts: First, I cannot agree with the conclusion that section 101 of the Civil Rights Act of 1991 does not apply in this case; second, even if section 101 did not apply, I would hold that the job of mailroom apprentice for which Fray applied would have created a new and distinct relationship between Fray and the World Herald.
 
 I.
 
 54
 I turn first to the issue of whether the Civil Rights Act of 1991 should apply in this case. Fray brought this action in June 1987, alleging that the World Herald violated section 1981, Title VII, and Nebraska law between 1984 and 1986. In June 1989, several months before trial, the Supreme Court decided Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. at 2363, 105 L.Ed.2d 132 (1989). The Court held that section 1981 prohibited racial discrimination only in the making and enforcement of contracts, and did not protect employees from racial harassment once they had been hired. Patterson, 491 U.S. at 182, 109 S.Ct. at 2375. In November 1991, while the appeals in this case were pending, the President signed the Civil Rights Act of 1991 into law, effectively overruling Patterson. Whether or not one believes that Patterson barred Fray's section 1981 action against the World Herald, it is undisputed that her section 1981 claims would succeed under the Act. See supra at 1373.
 
 
 55
 The question of whether the Act should apply to this case is a difficult one. The Supreme Court has failed to articulate a decisive rule for determining whether a statute is retroactive. Instead, as the majority notes, there is an apparent conflict between the Court's decisions in Thorpe v. Housing Auth., 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) and Bradley v. Richmond School Bd., 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) on the one hand, and Bowen v. Georgetown University Hosp., 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) on the other. In Bradley, the Court held that in the absence of clear legislative direction to the contrary courts should apply intervening statutory changes to pending cases, unless doing so would result in "manifest injustice." Bradley, 416 U.S. at 711, 94 S.Ct. at 2016. Without overturning Bradley, the Court later stated in Georgetown Hospital that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." Georgetown Hospital, 488 U.S. at 208, 109 S.Ct. at 471. Recently, in Kaiser Alum. & Chem Corp. v. Bonjorno, 494 U.S. 827, 837, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842, a majority of the Court recognized but declined to reconcile the "apparent tension" between these two rules of statutory construction.
 
 
 56
 The two rules are identical in one respect: Under both Bradley and Georgetown Hospital, "the courts must give effect to a clear congressional directive as to a statute's retroactivity." See supra at 1375. Drifting in the sea of confusion that Bradley and Georgetown Hospital engendered, the majority saw this settled rule of statutory construction and grabbed hold. After accurately chronicling the Act's legislative history, the majority reaches the conclusion that Congress intended the Act to operate only prospectively, thus obviating the need to choose between the two conflicting rules. The majority's reliance on what it considers to be Congress's intent is, however, misplaced. As much as I, too, would like to avoid delving into the murkiness of Bradley and Georgetown Hospital, I see no "clear congressional directive" that would relieve us of that responsibility.
 
 
 57
 The majority's holding rests on its contention that Congress's removal of the retroactivity provisions of the Act after the President's initial veto is "dispositive" of Congress's intent. If this is so, it is dispositive merely of Congress's intent to leave the retroactivity decision to the courts. The Act's legislative history, even as the majority recounts it, clearly demonstrates that Congress was split on the question of retroactivity. A large majority of senators and representatives voted for the explicitly retroactive Civil Rights Act of 1990, which President Bush vetoed. See 136 Cong.Rec. S.9966 (daily ed. July 18, 1990) (65 Senate votes for the bill, 34 opposed); 136 Cong.Rec. H.9975-03 (daily ed. Oct. 17, 1990) (273 House votes for the bill, 154 opposed); 136 Cong.Rec. 16562 (daily ed. Oct. 24, 1990) (President's veto). After the veto, Senator Kennedy, one of the 1991 Act's sponsors, stated that Congress would "leave it to the courts to determine the extent to which the bill will apply to cases and claims that are pending on the date of enactment." 137 Cong.Rec. S.15963 (daily ed. Nov. 5, 1991) (statement of Sen. Kennedy). Yet the Act's bipartisan sponsors disagreed on how the courts would decide the retroactivity question. See supra at 1376.
 
 
 58
 Legislative history is often ambiguous, and scholars and jurists alike continue to debate its value in statutory interpretation. In the case of the Civil Rights Act of 1991, however, the legislative history presents us with a clear picture of Congress's intent. A majority of Congress favored retroactivity, but retroactive legislation carried the risk of another presidential veto. Congress therefore deliberately left the Act retroactivity-neutral, reserving the issue for the courts to decide. Taking advantage of the different rules in Bradley and Georgetown Hospital, both sides claimed victory. Those who favored retroactivity, led by Senator Kennedy, stated their belief that the courts would apply Bradley to find the Act retroactive; opponents of retroactivity, led by Senator Danforth, assumed that under Georgetown Hospital courts would apply the act only prospectively. See supra n. 10 and accompanying text.
 
 
 59
 I agree with the majority that, under Georgetown Hospital, the Act would not apply retroactively to this case. Under Bradley, however, when legislation is silent on the issue of retroactivity, courts will apply it to pending cases in the absence of manifest injustice. As discussed above, this legislation fairly screams its silence. Moreover, as the majority recognizes, "retroactive application of section 101 to this pending case would neither alter the rights and expectations of the parties nor disturb previously vested rights." See supra at 1378. Contrary to the majority's holding, therefore, Bradley and Georgetown Hospital lead to different results in this case, forcing us either to attempt to reconcile these two cases or to choose between them.
 
 
 60
 Precedent in this circuit on the presumption for or against retroactivity is mixed. In Simmons v. Lockhart, 931 F.2d 1226, 1230 (8th Cir.1991), Chief Judge Arnold expressed a preference for the Georgetown Hospital presumption against retroactivity. The Supreme Court's opinion in Bonjorno, however, suggests that we cannot simply ignore one of the retroactivity rules because we might prefer the other. 494 U.S. at 837, 110 S.Ct. at 1577. Recently, in National Wildlife Fed. v. A.S.C.S., 955 F.2d 1199, 1204 (8th Cir.1992), we stated our belief that both Georgetown Hospital and Bradley are still binding precedent.[1] I believe, therefore, that where Georgetown Hospital and Bradley produce differing results, it is our task not to choose between them but to reconcile them as much as possible.
 
 
 61
 Reconciling seemingly opposite cases such as Bradley and Georgetown Hospital may seem an exercise in futility. Yet the Supreme Court must not consider the cases to be entirely at odds. For example, the Court did not even mention Bradley in its opinion in Georgetown Hospital. In Bonjorno, Justice O'Connor, writing for a plurality of the Court, referred only to the "apparent tension" between the two cases. 494 U.S. at 837, 110 S.Ct. at 1577. Four justices in Bonjorno stated that the tension between Bradley and Georgetown Hospital is "more apparent than real." Id. at 864, 110 S.Ct. at 1591 (White, J. dissenting).
 
 
 62
 In fact, there is a common thread that runs through both Bradley and Georgetown Hospital. In Bradley, the Court tempered its presumption of retroactivity with an exception for cases in which retroactivity would result in "manifest injustice." 416 U.S. at 711, 94 S.Ct. at 2016. It noted Justice Marshall's admonition in United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801) that courts must "struggle hard against a construction which will, by a retrospective operation, affect the rights of the parties." 416 U.S. at 717, 94 S.Ct. at 2019.
 
 
 63
 In the case of Georgetown Hospital, we cannot view the Court's statement that "[r]etroactivity is not favored in the law" as merely a blind acceptance of an historical rule, especially in light of the Court's decision not to overrule Bradley. Justice Story defined a retroactive law as one that "takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past." Elmer E. Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn.L.Rev. 775, 785 (1936). Where courts have disfavored retroactivity, it is because "it conflicts with the rule of law virtues of satisfying justified expectations, providing citizens with notice of the law so that they may efficiently plan their affairs, and similar concerns." Kenneth J. Kress, Legal Reasoning and Coherence Theories: Dworkin's Rights Thesis, Retroactivity, and the Linear Order of Decisions, 72 Calif.L.Rev. 369, 399 (1984). Moreover, retroactivity is troubling because "[i]t is conceptually impossible to 'break' a law that did not exist when one acted." Id. Professor Smead, cited by the majority in support of the principle that courts traditionally have disfavored retroactivity, notes that as the American common law developed in the nineteenth century, the rule against retroactivity "came more and more to be limited to apply to retrospective laws which impaired vested rights in both the older common law and the broader Kentian and Storian meanings." Smead, supra, at 787.
 
 
 64
 Both the Bradley and Georgetown Hospital decisions are thus based on an overriding concern for fairness. The Bradley rule's fairness factor is explicit and detailed. See 416 U.S. at 716-721, 94 S.Ct. at 2021. The Court considered "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." Id. at 717, 94 S.Ct. at 2019. The fairness element of Georgetown Hospital is less obvious but no less fundamental. Under the historical rule that Georgetown Hospital represents, retroactivity is disfavored where its application would interfere with a party's "justified expectations" or vested rights. In the absence of a clear directive from Congress on the issue of retroactivity, and so long as Bradley and Georgetown Hospital remain binding precedent, I would engage in a fairness analysis to determine whether section 101 of the Civil Rights Act of 1991 applies to Fray's action.
 
 
 65
 I believe that fairness requires us to apply section 101 in this case. As far as the identity of the parties is concerned, this is not a "mere private case[ ] between individuals," in which the rights of the parties are of paramount importance. Schooner Peggy, 5 U.S. (1 Cranch) at 110, 2 L.Ed. 49. Rather, this case involves civil rights, undisputedly a "great national concern" that merits a presumption of retroactivity. Id.; Bradley, 416 U.S. at 718-719, 94 S.Ct. at 2019-20.
 
 
 66
 The next element of the fairness calculus is a consideration of the relevant rights of the parties. The World Herald has a right not to be penalized for conducting its business in accordance with current laws. Fray, similarly, has a right to recover from her employer for violations of her civil rights as they exist at the time of her employment.
 
 
 67
 Our final concern is to avoid imposing "new and unanticipated obligations" on a party without notice or an opportunity to be heard. Bradley, 416 U.S. at 720, 94 S.Ct. at 2020. Fray began working at the World Herald in 1984 and brought suit in 1987. Until the Supreme Court decided Patterson in 1989, there was every indication that the conduct that formed the basis of Fray's complaint was actionable under section 1981. See supra at 1378. During the period that Fray worked at the World Herald, the newspaper was on notice that section 1981 might apply to an employer's conduct over the course of the employment relationship. In this case, therefore, application of the Civil Rights Act of 1991 best serves the interests of fairness by restoring the rights of the parties as they were when Fray began her lawsuit.
 
 
 68
 I recognize that this is an unsettled area of the law, and that courts that have considered whether the Act is retroactive have come down on both sides of the issue. See Appendix. Yet the majority's analysis of the Act's legislative history strains the bounds of credible statutory interpretation. It is disingenuous to say that Congress clearly intended the Act to operate only prospectively. In the absence of a clear directive from either Congress or the Supreme Court, we must interpret the law as best we can. I would apply section 101 of the Act to this case.
 
 II.
 
 69
 Even if I did not believe that the Act should apply in this case, I would not reverse Fray's judgment on her section 1981 claims. Under Patterson, a failure to promote based on race or sex is actionable under section 1981 if "the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer...." Patterson, 491 U.S. at 185, 109 S.Ct. at 2377. Our circuit has not yet had an opportunity to consider when a promotion meets the Patterson "new and distinct relationship" test. I agree with the majority that every career advancement does not create such a relationship. The majority, however, is too quick to dismiss the promotion for which Fray applied as a continuation of her prior relationship with the World Herald. The record is replete with evidence that the job as a mailroom apprentice would have involved the opportunity for Fray and the World Herald to enter into a new contract. Patterson, 491 U.S. at 185, 109 S.Ct. at 2377.
 
 
 70
 The job as mailroom apprentice was not simply a promotion for which employees in Fray's position were routinely considered. See, e.g., Bennun v. Rutgers State Univ., 941 F.2d 154 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992) (tenured associate professor to full professor); Harrison v. Associates Corp. of Amer., 917 F.2d 195 (5th Cir.1990) (CRT operator to lead CRT operator). Rather, Fray applied for the job in response to a posted notice seeking applicants. In fact, the man eventually hired for the position was a truck driver with no mailroom experience whatsoever. See Malhotra v. Cotter & Co., 885 F.2d 1305, 1311 (7th Cir.1989) (suggesting an interpretation of Patterson under which section 1981 would apply to promotions where someone not already working for the firm could fill the new position). The apprentice position, therefore, would have been an entirely new job for Fray.
 
 
 71
 Moreover, if the World Herald had hired Fray as a mailroom apprentice, the following aspects of her job would have changed:
 
 
 72
 * Different responsibilities. As a production worker, Fray primarily operated the inserting machine and cleaned the floors; as a mailroom apprentice, she would be operating the wrapping, stacking, and tying machines.
 
 
 73
 * Different pay status. At the time of her application for the mailroom apprentice position, Fray earned $4.25/hour and was eligible for occasional merit raises; as a mailroom apprentice, she would have started at $6.05/hour, and would have been on track for the full apprenticeship rate of $11/hour.
 
 
 74
 * Different hours. Fray would have moved from a part-time to a full-time position.
 
 
 75
 * Different benefits. The mailroom apprentice position would have entitled Fray to new benefits such as health, life, and disability insurance.
 
 
 76
 All of these changes are evidence of the considerable difference between the World Herald's relationships with its part-time production workers and its mailroom apprentices. Even under Patterson, therefore, I believe that Fray had a section 1981 cause of action against the World Herald for discriminatory failure to promote.
 
 
 77
 I respectfully dissent.
 
 APPENDIX
 
 78
 Cases refusing to apply the Act retroactively:
 
 
 79
 Ribando v. United Airlines, Inc., 787 F.Supp. 827 (N.D.Ill.1992).
 
 
 80
 McCormick v. Consolidation Coal Co., 786 F.Supp. 563 (N.D.W.Va. 1992).
 
 
 81
 Hatcher-Capers v. Haley, 786 F.Supp. 1054 (D.D.C. 1992).
 
 
 82
 Rowson v. County of Arlington, 786 F.Supp. 555 (E.D.Va. 1992).
 
 
 83
 Reynolds v. Frank, 786 F.Supp. 168 (D.Conn. 1992).
 
 
 84
 Sofferin v. American Airlines, 785 F.Supp. 780 (N.D.Ill. 1992).
 
 
 85
 Guillory-Wuerz v. Brady, 785 F.Supp. 889 (D.Colo. 1992).
 
 
 86
 McLaughlin v. State of New York, 784 F.Supp. 961 (S.D.N.Y. 1992).
 
 
 87
 Toney v. State of Alabama, 784 F.Supp. 1542 (M.D.Ala. 1992).
 
 
 88
 McCullough v. Consolidated Rail Corp., 785 F.Supp. 1309 (N.D.Ill. 1992).
 
 
 89
 Hameister v. Harley-Davidson, Inc., 785 F.Supp. 113 (E.D.Wis. 1992).
 
 
 90
 Percell v. International Business Machines, Inc., 785 F.Supp. 1229 (E.D.N.C. 1992).
 
 
 91
 Steinle v. Boeing Co., 785 F.Supp. 1434 (D.Kan. 1992).
 
 
 92
 Cook v. Foster Forbes Glass, 783 F.Supp. 1217 (E.D.Mo. 1992).
 
 
 93
 Thompson v. Johnson & Johnson Mgmt. Info. Ctr., 783 F.Supp. 893 (D.N.J. 1992).
 
 
 94
 Patterson v. McLean Credit Union, 784 F.Supp. 268 (M.D.N.C. 1992).
 
 
 95
 Kimble v. DPCE, Inc., 784 F.Supp. 250 (E.D.Pa. 1992).
 
 
 96
 Thomas v. Frank, 1992 WL 59037 (D.N.J. Feb. 13, 1992).
 
 
 97
 Curry v. Chicago Cent. & Pac. R.R., 1992 WL 25459 (N.D.Iowa Feb. 10, 1992) (unreported).
 
 
 98
 Tyree v. Riley, 783 F.Supp. 877 (D.N.J. 1992).
 
 
 99
 Maddox v. Norwood Clinic, Inc., 783 F.Supp. 582 (N.D.Ala.1992).
 
 
 100
 West v. Pelican Mgmt. Svcs. Corp., 782 F.Supp. 1132 (M.D.La.1992).
 
 
 101
 Doe v. Board of County Comm'rs, 783 F.Supp. 1379 (S.D.Fla. 1992).
 
 
 102
 Burchfield v. Derwinski, 782 F.Supp. 532 (D.Colo.1992).
 
 
 103
 Johnson v. Rice, 1992 WL 16284 (S.D.Ohio Jan. 24, 1992) (unreported).
 
 
 104
 Simons v. Southwest Petro-Chem, Inc., 1992 WL 25218 (D.Kan. Jan. 22, 1992) (unreported).
 
 
 105
 Khandelwal v. Compuadd Corp., 780 F.Supp. 1077 (E.D.Va.1992).
 
 
 106
 Futch v. Stone, 782 F.Supp. 284 (M.D.Pa.1992).
 
 
 107
 Mitchell v. Secretary of Commerce, 1992 WL 10509 (D.D.C. Jan. 10, 1992) (unreported).
 
 
 108
 High v. Broadway Ind., Inc., 1992 WL 33860, 1992 U.S.Dist. LEXIS 446 (W.D.Mo. Jan. 7, 1992) (unreported).
 
 
 109
 Sorlucco v. New York City Police Dept., 780 F.Supp. 202 (S.D.N.Y.1992).
 
 
 110
 Van Meter v. Barr, 778 F.Supp. 83 (D.D.C.1991).
 
 
 111
 James v. American Internat'l Recovery, Inc., 1991 WL 281734 (N.D.Ga. Dec. 3, 1991) (unreported).
 
 
 112
 Hansel v. Public Serv. Co. of Colo., 778 F.Supp. 1126 (D.Colo.1991).
 
 
 113
 Cases applying some or all of the Act retroactively:
 
 
 114
 Lee v. Sullivan, 787 F.Supp. 921 (N.D.Cal.1992).
 
 
 115
 Andrade v. Crawford & Co., 786 F.Supp. 1302 (N.D.Ohio 1992).
 
 
 116
 Sample v. Keystone Carbon Co., 786 F.Supp. 527 (W.D.Pa. 1992).
 
 
 117
 United States v. Department of Mental Health, 785 F.Supp. 846 (E.D.Cal. 1992).
 
 
 118
 Poston v. Reliable Drug Stores, Inc., 783 F.Supp. 1166 (S.D.Ind. 1992).
 
 
 119
 Sanders v. Culinary Workers Union Local No. 226, 783 F.Supp. 531 (D.Nev.1992).
 
 
 120
 Watkins v. Bessemer State Tech. Coll., 782 F.Supp. 581 (N.D.Ala.1992).
 
 
 121
 Joyner v. Monier Roof Tile, Inc., 784 F.Supp. 872 (S.D.Fla. 1992).
 
 
 122
 Long v. Carr, 784 F.Supp. 887 (N.D.Ga. 1992).
 
 
 123
 Graham v. Bodine Electric Co., 782 F.Supp. 74 (N.D.Ill.1992).
 
 
 124
 Bristow v. Drake Street, Inc., 1992 WL 14262 (N.D.Ill. Jan. 21, 1992) (unreported).
 
 
 125
 Goldsmith v. City of Atmore, 782 F.Supp. 106 (S.D.Ala.1992).
 
 
 126
 Guuess v. City of Portage, 1992 WL 8722 (N.D.Ind. Jan. 14, 1992) (unreported).
 
 
 127
 Saltarikos v. Charter Mfg. Co., 782 F.Supp. 420 (E.D.Wis.1992).
 
 
 128
 Stender v. Lucky Stores, Inc., 780 F.Supp. 1302 (N.D.Cal.1992).
 
 
 129
 King v. Shelby Med. Center, 779 F.Supp. 157 (N.D.Ala.1991).
 
 
 130
 Davis v. Tri-State Mack Dist., Inc., 1991 WL 316891, 1991 U.S.Dist. LEXIS 19380 (E.D.Ark. Dec. 16, 1991) (unreported).
 
 
 131
 La Cour v. Harris County, 1991 WL 321020, 1991 U.S.Dist. LEXIS 19223 (S.D.Tex. Dec. 6, 1991) (unreported).
 
 
 132
 Mojica v. Gannett Co., 779 F.Supp. 94 (N.D.Ill.1991).
 
 
 
 [1]
 Fray had also applied for two pressroom apprentice positions. The World Herald promoted white men with pressroom experience to both positions. The jury rejected Fray's discrimination claims relating to these two failures to promote
 
 
 [2]
 These statutory causes of action are found in 42 U.S.C. § 1981, 42 U.S.C. § 2000e et seq., and Neb.Rev.Stat. § 20-148, respectively
 
 
 [3]
 See Partee v. Metropolitan Sch. Dist. of Washington Township, 954 F.2d 454, 457 (7th Cir.1992) (teacher's promotion); Wall v. Trust Co. of Ga., 946 F.2d 805, 808-09 (11th Cir.1991) (customer service rep to tax analyst); Bennun v. Rutgers State Univ., 941 F.2d 154, 169-70 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992) (tenured associate professor to full professor); Mozee v. American Com. Mar. Serv. Co., 940 F.2d 1036, 1054-55 (7th Cir.1991) (crane operator to gantry crane operator and worker to leadman); Rountree v. Fairfax County School Bd., 933 F.2d 219, 223-24 (4th Cir.1991) (merit pay system); Harrison v. Associates Corp. of Amer., 917 F.2d 195, 198 (5th Cir.1990) (CRT operator to lead CRT operator)
 
 
 [4]
 See Great American Tool and Mfg. Co. v. Adolph Coors Co., 780 F.Supp. 1354, 1355 (D.Colo.1992)
 
 
 [5]
 The district court decisions are collected in the appendix to this opinion
 
 
 [6]
 Simmons was written by Chief Judge Arnold as a single judge deciding an application for the award of attorneys' fees in a habeas corpus case. We agree with Chief Judge Arnold's analysis of the retroactivity issue
 
 
 [7]
 For example, § 15(a)(6) of the 1990 bill provided that the counterpart to § 101(2)(b) of the 1991 Act would apply to all cases pending on or commenced after June 15, 1989, the date of the Patterson decision. See 136 Cong.Rec. S.9968 (daily ed. July 18, 1990)
 
 
 [8]
 H.R. 1 as introduced, and the Brooks/Fish substitute bill that ultimately passed the House on June 5, 1991, contained virtually the same retroactivity provisions as the 1990 bill. See Hearings on H.R. 1 Before the House Comm. on Educ. & Labor, 102d Cong., 1st Sess., at 17-19 (1991); 137 CONG.REC. H.3924-25, 3936 (daily ed. June 5, 1991)
 
 
 [9]
 After S.1745 passed the Senate, S.1962 was introduced to repeal § 402(b). See 137 Cong.Rec. S.16611 (daily ed. Nov. 13, 1991). Congress has not passed S.1962
 
 
 [10]
 Compare 137 Cong.Rec. S.15485 (daily ed. Oct. 30, 1991) (statement of Sen. Kennedy); Id. at S.15963-64 (daily ed. Nov. 5, 1991) (statement and interpretive memorandum submitted by Sen. Kennedy); Id. at H.9530-31 (daily ed. Nov. 7, 1991) (interpretive memorandum submitted by Rep. Edwards); Id. at H.9549 (daily ed. Nov. 7, 1991) (statement of Rep. Fish) (interpreting the Act as retroactive) with 137 Cong.Rec. S. 15478 (daily ed. Oct. 30, 1991) (section-by-section analysis representing the views of the administration and Sens. Dole, Burns, Cochran, Garn, Gorton, Grassley, Hatch, Mack, McCain, McConnell, Murkowski, Simpson, Seymour and Thurmond); Id. at S.15483 (daily ed. Oct. 30, 1991) (interpretive memorandum submitted by Sen. Danforth); Id. at S.15953 (daily ed. Nov. 5, 1991) (statement of Sen. Dole); Id. at S.15966 (daily ed. Nov. 5, 1991) (statement of Sens. Gorton, Durenberger and Simpson); Id. at H.9512 (daily ed. Nov. 7, 1991) (statement of Rep. Hyde); Id. at H.9548 (daily ed. Nov. 7, 1991) (interpretive memorandum submitted by Rep. Hyde); Id. at S.17085 (daily ed. Nov. 19, 1991) (colloquy between Sens. Levin and Rudman) (interpreting the Act as prospective)
 
 
 [11]
 Union Pac. R.R. v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913), quoted in Security Ind. Bank, 459 U.S. at 79, 103 S.Ct. at 413, and in Greene v. United States, 376 U.S. at 160, 84 S.Ct. at 621
 
 
 [12]
 The manifest injustice analysis would obviously be quite different if the pending § 1981 claim was against a small employer that is exempt from Title VII for conduct occurring after the decision in Patterson. This illustrates one of Justice Scalia's criticisms of Bradley--that the manifest injustice exception transforms a rule of law to a rule of discretion, "giving judges power to expand or contract the effect of legislative action," Bonjorno, 494 U.S. at 857, 110 S.Ct. at 1587
 
 
 [1]
 We were not forced to choose between the two cases because we concluded that Congress clearly intended the statute in question to operate retroactively. National Wildlife Fed., at 1205